Donna PING, Executrix of the Estate of Alma Calhoun Duncan, Deceased, Appellant

v.

BEVERLY ENTERPRISES, INC., et al., Appellees.

No. 2010–SC–000558–DG.

Supreme Court of Kentucky.

Aug. 23, 2012.

582

Stephen M. O'Brien, III, Lexington, KY, Counsel for Appellant.

Marcia L. Pearson, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Louisville, KY, Counsel for Appellees.

Kevin Crosby Burke, Louisville, KY, Jay R. Vaughn, Busald Funk & Zevely, P.S.C., Florence, KY, Counsel for Amicus Curiae.

Opinion of the Court by Justice ABRAMSON.

In October 2008, Donna Ping, as the executrix of the Estate of her deceased mother, Alma Calhoun Duncan, of Lawrenceburg, Kentucky, brought suit in the Franklin Circuit Court against the owners and operators of The Golden Living Center, a long-term care facility in Frankfort, where the seventy-nine year old Mrs. Duncan spent the last several months of her life. The executrix alleges that negligence by the facility's staff and the breach by its management of statutes regulating the provision of nursing home services resulted in injuries to Mrs. Duncan and in her wrongful death. Invoking an Arbitration Agreement executed in conjunction with Mrs. Duncan's admission to the nursing home, the Defendants[1] moved the trial court to dismiss the complaint or to stay it pending arbitration. (The Appellees–Defendants are hereafter referred to collectively as "Beverly Enterprises" or simply as "Beverly.") The trial court denied that motion and explained that in its view Ms. Ping, who executed the Admissions Agreement on behalf of her mother, had not had authority to agree to arbitration, and further that the nursing home had obtained Ms. Ping's signature on the agreement by wrongful means and without providing consideration. Beverly Enterprises appealed that ruling to the Court of Appeals, which reversed. The appellate panel rejected the reasons offered by the trial court for invalidating the Arbitration Agreement, as well as several others offered by the executrix, and held that under Kentucky Revised Statutes (KRS) 417.045 *et seq.*, Kentucky's Uniform Arbitration Act, the agreement was to be enforced. We granted the executrix's motion for discretionary review to consider the important question of an agent's authority to bind his or her principal, as well as others, to an arbitration agreement presented with other documents upon the principal's admission to a long-term care facility. Because we agree with the trial court that the agent in this case, Ms. Ping, was not authorized to enter an optional arbitration agreement, we reverse the decision of the Court of Appeals and remand the matter to the Franklin Circuit Court for additional proceedings.

## RELEVANT FACTS

There is no significant dispute about the relevant facts. In 1998, Mrs. Duncan executed a writing, entitled "General Power of Attorney," in which she named her daughter, Ms. Ping, as her agent. Ms. Ping was given authority "to do and perform any, all, and every act and thing whatsoever requisite and necessary to be done, to and for all intents and purposes, as I might or could do if personally present, including but not limited to the following: . . ."

The document then specifically authorized several acts pertaining to the management of Mrs. Duncan's property and finances, such as "tak[ing] possession of any and all monies, goods, chattels, and effects belonging to me, wheresoever found; . . . receiv[ing], deposit[ing], invest[ing] and spend[ing] funds on my behalf; . . . tak[ing] charge of any real estate which I may own in my own name or together with other owners, legally or equitably, and to

---

1. The Appellees–Defendants in this case are Beverly Enterprises, Inc.; Beverly Enterprises–Kentucky, Inc.; GGNSC Administrative Services, LLC; GGNSC Holdings, LLC; GGNSC Equity Holdings, LLC; Golden Gate National Senior Care, LLC; Golden Gate Ancillary, LLC; and GGNSC Frankfort, Inc.

mortgag[ing], convey[ing] or sell[ing] said real estate and perform[ing] any acts necessary to mortgage, convey or sell said real estate." The document also authorized Ms. Ping "[t]o make any and all decisions of whatever kind, nature or type regarding my medical care, and to execute any and all documents, including, but not limited to, authorizations and releases, related to medical decisions affecting me; and [t]o generally do any and every further act and thing of whatever kind, nature, or type required to be done on my behalf."

Finally, Mrs. Duncan declared that it was her

> intention and desire that this document grant to my said attorney-in-fact full and general power and authority to act on my behalf and I thus direct that the language of this document be liberally construed with respect to the power and authority hereby granted my said attorney-in-fact in order to give effect to such intention and desire. The enumeration of specific items, rights, or acts or powers herein is not intended to, nor does it limit or restrict, the general and full power herein granted to my said attorney-in-fact. It is further my intention and desire that this document qualify as a DURABLE POWER OF ATTORNEY pursuant to KRS 386.093 and that the power and authority hereby granted by this document shall not be affected by any later disability or incapacity of me as principal.

Ms. Ping testified that she had no occasion to exercise her power of attorney until early 2006. In February of that year, Mrs. Duncan suffered a broken leg, which required surgery and a hospitalization. Less than two weeks later, while Ms. Duncan was residing at a facility for the rehabilitation of that injury, she suffered a stroke. She was returned to the hospital, and when her condition had again stabilized, she was moved, at her daughter's direction, to the Beverly Enterprises facility. The move took place on March 17, 2006. According to Ms. Ping, on that day her mother was still incapacitated as a result of her stroke and would not have been able to manage her own admission.

On her mother's behalf, Ms. Ping met with the facility's admissions director, who, according to Ms. Ping, presented her with a stack of documents—what he referred to as the standard application packet—each one of which she signed where he indicated, without having read it or otherwise being aware of its contents. Among those documents was one headed, "RESIDENT AND FACILITY ARBITRATION AGREEMENT (NOT A CONDITION OF ADMISSION—READ CAREFULLY)." As filled in by the admissions director, the parties to this agreement were "BHR Frankfort (the "Facility") and Alma Duncan ("Resident")." The agreement was printed on one-and-a-half single-spaced pages, followed by date and signature lines. Ms. Ping signed the agreement as her mother's "Authorized representative," and the agreement reflects that she is related to the resident both as daughter and as power of attorney.

In pertinent part, the agreement provides that upon execution it would become part of the Admission Agreement,

> and that the Admission Agreement evidences a transaction involving interstate commerce governed by the Federal Arbitration Act. It is understood and agreed by Facility and Resident that any and all claims, disputes, and controversies ... arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration to be conducted

at a place agreed upon by the Parties, or in the absence of such an agreement, at the Facility, in accordance with the National Arbitration Forum Code of Procedure ... and not by a lawsuit or resort to court process.

The Arbitration Agreement does not purport to limit the remedies available under Federal or State law; it includes a provision allowing the resident to rescind the Arbitration Agreement unilaterally by giving notice to the Facility within thirty days of execution; and it includes a warning, in bold, capital letters, that "BY ENTERING INTO THIS ARBITRATION AGREEMENT, THE PARTIES ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY, AS WELL AS ANY APPEAL FROM A DECISION OR AWARD OF DAMAGES."

The agreement also provides that

it is the intention of the parties to this Arbitration Agreement that it shall inure to the benefit of and bind the parties, their successors, and assigns, including without limitation the agents, employees and servants of the Facility, and all persons whose claim is derived through or oh behalf of the Resident, including any parent, spouse, sibling, child, guardian, executor, legal representative, administrator, or heir of the Resident.

About six months after her admission to the Beverly facility, Mrs. Duncan died. The probate court of Anderson County appointed Ms. Ping as the executrix of her mother's Estate, and in that capacity Ms. Ping brought the present action against Beverly Enterprises. The Estate alleges that Mrs. Duncan suffered compensable injuries as a result both of negligent treatment by her caretakers at the facility and of management's breach of statutory standards for nursing home administration. As executrix, Ms. Ping also represents the statutory wrongful death beneficiaries, who claim that the injuries Mrs. Duncan suffered at the facility hastened her demise, and so give them a claim for damages separate from the claim of the Estate. The sole issue presented is whether these claims are subject to the Arbitration Agreement Ms. Ping purported to execute in her capacity as her mother's agent. Ruling that they are, the Court of Appeals held that Ms. Ping enjoyed a virtually unlimited authority to act on her mother's behalf, that binding her mother to the Arbitration Agreement was within that expansive authority, and accordingly that that agreement binds as well her mother's Estate. The Estate contends that the Court of Appeals read too broadly Mrs. Duncan's power of attorney. We agree.

## ANALYSIS

### I. Mrs. Duncan's Power Of Attorney For Property and Health Care Management Did Not Authorize Her Agent to Agree to Arbitration.

**A. The Kentucky Courts Have Jurisdiction to Enforce the Arbitration Agreement, If It is Valid and Enforceable.**

Because the dispute before us concerns the effect of an arbitration agreement, it potentially implicates both the Kentucky Uniform Arbitration Act, KRS 417.045 *et seq.*, and the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* Both Acts evince a legislative policy favoring arbitration agreements, or at least shielding them from disfavor. Under the Kentucky Act,

A written agreement to submit any existing controversy to arbitration or a provision in [a] written contract to submit to arbitration any controversy there-

after arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law for the revocation of any contract.

KRS 417.050 (1996).[2]

█ Similarly, the Federal Act provides that,

A written provision in any maritime transaction or a contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The thrust of both Acts is to ensure that arbitration agreements are enforced no less rigorously than are other contracts and according to the same standards and principles. *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 275, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (Federal Act's basic purpose is "to put arbitration provisions on 'the same footing' as a contract's other terms."); *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850 (Ky. 2004) (Kentucky Act serves same purposes as the Federal Act.).

█ The Estate maintains Kentucky courts lack jurisdiction to enforce the Arbitration Agreement in this case because it does not comply with the Kentucky Act as outlined in *Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451 (Ky.2009). In *Ally Cat*, this Court held that the Kentucky Act applies only to arbitration agreements providing for arbitration in this State. Here, the agreement provides that the arbitration is "to be conducted at a place agreed upon by the Parties, or in the absence of such an agreement, at the Facility." The Estate maintains that because the contract would allow the arbitration to take place outside Kentucky, if the parties so agreed, a Kentucky trial court is without jurisdiction to enforce it. However, because either party can insist upon a Kentucky arbitration (an arbitration "at the Facility" in Frankfort), the trial court's jurisdiction under the Kentucky Act was properly invoked. In any event, even if the forum selection clause was not consistent with *Ally Cat*, Kentucky courts must and do enforce arbitration clauses in contracts subject to the Federal Act. *North Fork Collieries, LLC v. Hall*, 322 S.W.3d 98, 102, fn. 2 (Ky.2010).

█ The Federal Act applies to arbitration provisions in contracts "evidencing a transaction involving [interstate] commerce," 9 U.S.C. § 2, and almost certainly applies here. Congress's commerce power is interpreted broadly, and "may be exercised in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice ... subject to federal control." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56–57, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) (citation and internal quotation marks omitted). The Supreme Court has held that health care is one such activity. *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) (hospital's purchase of out-of-State medicines and acceptance of out-of-State insurance establish interstate commerce). Several courts, moreover, have applied the FAA to arbitration provisions in nursing

**2.** Section 250 of the Kentucky Constitution requires the General Assembly to adopt laws providing for arbitration of disputes. Thus, arbitration is constitutionally based in Kentucky.

home admission contracts. *See, e.g., Cook v. GGNSC Ripley, LLC,* 786 F.Supp.2d 1166 (N.D.Miss.2011); *Carter v. SSC Odin Operating Company, LLC,* 353 Ill.Dec. 422, 955 N.E.2d 1233 (2011); *Barker v. Evangelical Lutheran Good Samaritan Society,* 720 F.Supp.2d 1263 (D.N.M.2010); *Estate of Eckstein v. Life Care Centers of America, Inc.,* 623 F.Supp.2d 1235 (E.D.Wash.2009); *Triad Health Management of Ga., III, LLC v. Johnson,* 298 Ga.App. 204, 679 S.E.2d 785 (2009).[3] We conclude, as did the Court of Appeals, that the Federal Act applies as well as the State Act, although the parties apparently did not address the interstate commerce question to the trial court. Where the Federal Act applies, it "is enforceable in State, as well as federal court, *Southland Corporation v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), and indeed, '[u]nder the FAA, state courts as well as federal courts are obliged to honor and enforce agreements to arbitrate.' *Vaden v. Discover Bank,* 556 U.S. 49, 129 S.Ct. [1262] at 1278, 173 L.Ed.2d 206 [ ( 2009) ]." *North Fork Collieries,* 322 S.W.3d at 102, fn. 2.

Under both Acts, a party seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Louis-ville Peterbilt, Inc.,* 132 S.W.3d 850. Unless the parties clearly and unmistakably manifest a contrary intent, that initial showing is addressed to the court, not the arbitrator, *First Options,* and the existence of the agreement depends on state law rules of contract formation. *Id.; Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009). An appellate court reviews the trial court's application of those rules *de novo,* although the trial court's factual findings, if any, will be disturbed only if clearly erroneous. *North Fork Collieries,* 322 S.W.3d at 102.

**B. Ms. Ping Did Not Have Actual Authority to Enter the Arbitration Agreement.**

Here, Beverly Enterprises maintains that Ms. Ping, as her mother's agent, could and did validly agree on her mother's behalf to arbitrate any disputes arising in conjunction with Mrs. Duncan's residence at Beverly's facility. Whether this is so depends on the scope of the authority Mrs. Duncan conferred on her daughter through her power of attorney. The construction of a power of attorney is a question of law for the court. *Wabner v. Black,* 7 S.W.3d 379, 381 (Ky.1999); *Ingram v. Cates,* 74 S.W.3d 783 (Ky.App. 2002). Beverly emphasizes the power of attorney's provisions to the effect that Ms. Ping was to have "full and complete power

---

**3.** Beverly contends that the FAA applies because the agreement says it does: "[T]he parties agree ... that the Admission Agreement evidences a transaction involving interstate commerce governed by the Federal Arbitration Act." We reject this contention, however, and agree with the Supreme Court of Massachusetts, which observed, when confronted with a like claim, that "the Federal Act applies when Congress's commerce power is implicated. Determining when that is so depends on the broad constitutional limits of what constitutes an act in interstate commerce. The parties cannot by agreement make an act not in interstate commerce into one that is in interstate commerce. They can, however, agree that the Federal Act will provide the basis for interpreting the contract, even if the Federal Act would not otherwise apply in a binding way on a State court. Applying the Federal Act as an interpretive guide would only apply once the agreement is deemed valid and enforceable." *Miller v. Cotter,* 448 Mass. 671, 863 N.E.2d 537, 544 nt. 13 (2007). In short, the FAA applies not because the parties say so, but because the transaction is connected to interstate commerce.

and authority to do and perform any, all, and every act and thing whatsoever requisite and necessary to be done, ... as I might or could do if personally present," that the document was to be "liberally construed" with respect to Ms. Ping's authority, and that "the enumeration of specific items, rights, or acts or powers herein is not intended to, nor does it limit or restrict, the general full power" granted to Ms. Ping. Beverly insists these provisions establish that Ms. Ping was fully authorized not merely to make financial and health-care decisions for her mother—the only decisions specifically provided for in the document—but to make any and all other decisions as well, including an independent decision to relinquish her mother's right of access to the courts. We disagree.

■■■■■ An agency, this Court has noted, "is the fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Phelps v. Louisville Water Company*, 103 S.W.3d 46, 50 (Ky. 2003) (citation and internal quotation marks omitted). A power of attorney is a written, often formally acknowledged, manifestation of the principal's intent to enter into such a relationship with a designated agent. Since the principal's control of the agent is generally deemed an essential element of the agency relationship, *Phelps, supra,* under the common law the principal's death or incapacity brought the relationship to an end. *Rice v. Floyd,* 768 S.W.2d 57 (Ky.1989); *Restatement (Second) of Agency,* § 120, 122 (1958). In response, however, to an aging population's increasing need for the means to plan for disability and incapacity, in 1969 the Uniform Probate Code was amended to include provisions allowing for a "dura-

ble" power of attorney, an agency, that is, that would continue beyond the principal's incapacity. By 1984, every state had adopted legislation to that effect. Linda S. Whitton, *Durable Powers as an Alternative to Guardianship: Lessons We Have Learned,* 37 Stetson L. Rev. 7 (2007).

■■■■ KRS 386.093 is the pertinent statute in Kentucky. First enacted in 1972 and most recently revised in 2000, that act provides in pertinent part that

(1) ... "durable power of attorney" means a power of attorney by which a principal designates another as the principal's attorney in fact in writing and the writing contains the words, "This power of attorney shall not be affected by subsequent disability or incapacity of the principal, or lapse of time", or "This power of attorney shall become effective upon the disability or incapacity of the principal", or similar words showing the intent of the principal that the authority conferred shall be exercisable notwithstanding the principal's subsequent disability or incapacity, and, unless it states a time of termination, notwithstanding the lapse of time since the execution of the instrument.

(2) All acts done by an attorney in fact under a durable power of attorney during any period of disability or incapacity of the principal have the same effect and inure to the benefit of and bind the principal and the principal's successors in interest as if the principal were competent and not disabled.

Because Mrs. Duncan's power of attorney clearly manifested her intent that it be durable, under this statute Ms. Ping's agency did not lapse when her mother became incapacitated, but continued in effect, "as if the principal were competent and not disabled." *Id.*

■■■■ Although the statute allows durable powers of attorney to be created, it

does not address what authority may be granted therein. The scope of that authority is thus left to the principal to declare, and generally that declaration must be express. In *Rice*, 768 S.W.2d at 59, this Court explained that even a "comprehensive" durable power would not be understood as implicitly authorizing all the decisions a guardian might make on behalf of a ward. Rather, we have indicated that an agent's authority under a power of attorney is to be construed with reference to the types of transaction expressly authorized in the document and subject always to the agent's duty to act with the "utmost good faith." *Wabner*, 7 S.W.3d at 381. This is consistent with section 37 of the *Restatement (Second) of Agency*, which provides that

> (1) Unless otherwise agreed, general expressions used in authorizing an agent are limited in application to acts done in connection with the act or business to which the authority primarily relates.
>
> (2) The specific authorization of particular acts tends to show that a more general authority is not intended.

Here, Mrs. Duncan's power of attorney relates expressly and primarily to the management of her property and financial affairs and to assuring that health-care decisions could be made on her behalf. The general expressions upon which Beverly relies did not give Ms. Ping a sort of universal authority beyond those express provisions. On the contrary, even by their terms the general expressions are limited to "every act and thing whatsoever *requisite and necessary* to be done," and again to "every further act and thing of whatever kind, nature, or type *required* to be done on my behalf," acts, that is, necessary or required to give effect to the financial and health-care authority expressly created. These general expressions thus make explicit the incidental authority noted in

section 35 of the *Restatement*: "Unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." *Restatement (Second) of Agency* § 35 (1958). Understood as. Beverly contends, as grants of universal authority, the general expressions would tend to render the specific financial and health-care provisions superfluous, contrary to the fundamental rule that a written agreement generally will be construed "as a whole, giving effect to all parts and every word in it if possible." *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986).

Our careful approach to the authority created by a power of attorney is also consistent with the provision in the *Restatement (Third) of Agency* incorporating the provisions cited above as follows:

> (1) An agent has actual authority to take action designated or implied in the principal's manifestations to the agent and acts necessary and incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act.

*Restatement (Third) of Agency* § 2.02 (2006). We are not persuaded either that Ms. Ping did understand, or that she reasonably could have understood her authority under the power of attorney to apply to all decisions on her mother's behalf whatsoever, as opposed, rather, to decisions reasonably necessary to maintain her mother's property and finances and to decisions reasonably necessary to provide for her mother's medical care.

Of particular pertinence to this case is comment h. to *Restatement* § 2.02, headed, "Consequences of act for principal." As the comment notes,

[e]ven if a principal's instructions or grant of authority to an agent leave room for the agent to exercise discretion, the consequences that a particular act will impose on the principal may call into question whether the principal has authorized the agent to do such acts. Three types of acts should lead a reasonable agent to believe that the principal does not intend to authorize the agent to do the act. First are crimes and torts, ... Second, acts that create no prospect of economic advantage for the principal, ... *Third, some acts that are otherwise legal create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal. A reasonable agent should consider whether the principal intended to authorize the commission of collateral acts fraught with major legal implications for the principal, such as granting a security interest in the principal's property or executing an instrument confessing judgment. In such circumstances, it would be reasonable for the agent to consider whether a person in the principal's situation, having the principal's interests and objectives, would be likely to anticipate that the agent would commit such a collateral act, given the nature of the principal's specific direction to the agent.*

*Restatement (Third) of Agency* § 2.02 comment h. (2006) (emphasis supplied). We would place in this third category of acts with significant legal consequences a collateral agreement to waive the principal's right to seek redress of grievances in a court of law. Absent authorization in the power of attorney to settle claims and disputes or some such express authorization addressing dispute resolution, authority to make such a waiver is not to be inferred lightly. Here, nothing in Mrs. Duncan's power of attorney suggests her intent that Ms. Ping make such waivers on her behalf.

Our conclusion that Ms. Ping was not authorized to bind her mother to Beverly Enterprises' optional Arbitration Agreement is in accord with the decisions of other courts confronted with the same issue. On the one hand, where an agreement to arbitrate is presented to the patient as a condition of admission to the nursing home, courts have held that the authority incident to a health-care durable power of attorney includes the authority to enter such an agreement. *Owens v. National Health Corporation*, 263 S.W.3d 876 (Tenn.2008); *Triad Health Management of Ga.*, 679 S.E.2d 785. On the other hand, where, as here, the arbitration agreement is not a condition of admission to the nursing home, but is an optional, collateral agreement, courts have held that authority to choose arbitration is not within the purview of a health-care agency, since in that circumstance agreeing to arbitrate is not a "health care" decision.[4] *Dickerson v. Longoria*, 414 Md. 419, 995 A.2d 721 (2010); *Koricic v. Beverly Enterprises–Nebraska, Inc.*, 278 Neb. 713, 773 N.W.2d 145 (2009); *Mississippi Care Center of Greenville, LLC v. Hinyub*, 975 So.2d 211 (Miss.2008); *Estate of Irons v. Arcadia Healthcare L.C.*, 66 So.3d 396 (Fla.Dist.Ct.App.2011). *But see Barron v. Evangelical Lutheran Good Samaritan Society*, 150 N.M. 669, 265 P.3d 720 (N.M.App.2011) (holding that health-care agent's incidental authority extended to nursing-home admission contract's optional arbitration agreement).

---

4. We note that in the related context of health-care surrogacy under KRS Chapter 311, "health care decision" is defined as "consenting to, or withdrawing consent for, any medical procedure, treatment, or intervention." KRS 311.621(8).

Courts have also held that an optional nursing home arbitration agreement does not involve a financial decision within the authority of an agent authorized to manage his or her principal's property and finances. *Dickerson*, 995 A.2d 721; *Carrington Place of St. Pete, LLC v. Estate of Milo*, 19 So.3d 340 (Fla.Dist.Ct.App.2009). We agree with these cases and hold that Mrs. Duncan's power of attorney, properly construed as giving her daughter authority to manage Mrs. Duncan's property and finances and to make health-care decisions on her behalf, did not thereby authorize Ms. Ping to waive, where there was no reasonable necessity to do so, her mother's right of access to the courts.

### C. Ms. Ping Did Not Have Apparent Authority to Enter the Arbitration Agreement.

Against this conclusion, Beverly argues that even if Ms. Ping did not have actual authority to bind her mother to the Arbitration Agreement, she had apparent authority to do so, and on that basis the agreement should be upheld. An agent is said to have apparent authority to enter transactions on his or her principal's behalf with a third party when the principal has manifested to the third party that the agent is so authorized, and the third party reasonably relies on that manifestation. The principal will then be bound by such a transaction even if the agent was not actually authorized to enter it. *Mill Street Church of Christ v. Hogan*, 785 S.W.2d 263 (Ky.App.1990). *See also Restatement (Second) of Agency* § 27 (1958); *Restatement (Third) of Agency* § 2.03 (2006). Beverly maintains that the document containing Mrs. Duncan's power of attorney, which Ms. Ping showed to the admissions director, was couched in such broad and general terms that a reasonable third person would have believed that it authorized Ms. Ping to enter the Arbitra-

tion Agreement on her mother's behalf. As explained above, however, the power of attorney is reasonably understood as granting Ms. Ping authority to make only health care and property or finance-related decisions. Beverly could not, therefore, reasonably rely on the power of attorney as "apparently" granting more authority than on its face it does.

Beverly also contends that Ms. Ping held herself out as authorized to "sign the documents," and thus that it could rely on her apparent authority to enter the Arbitration Agreement. This contention fails for at least a couple of reasons. First, it appears that Ms. Ping believed that she was signing her mother's "admission" documents, which is how the admissions director presented them to her. Her willingness to sign, therefore, was not necessarily an assertion that she believed herself to have authority to execute an arbitration agreement collateral to the admission. More importantly, as noted above, apparent authority arises not from the purported agent's manifestations of authority, but rather from manifestations by the principal. The principal here, Mrs. Duncan, was incapacitated at the time of her admission and so could not have done anything to lead Beverly to believe that her daughter had more authority than the power of attorney said she had.

### D. The Estate is Not Equitably Estopped From Disavowing the Arbitration Agreement.

Beverly next maintains that because Ms. Ping held herself out as authorized to enter the Arbitration Agreement on behalf of her mother, her mother's Estate should now be equitably estopped from denying that authority. Equitable estoppel is a defensive doctrine founded on the principles of fraud, under which one party is prevented

from taking advantage of another party whom it has falsely induced to act in some injurious our detrimental way. Under Kentucky law, "equitable estoppel requires both a material misrepresentation by one party and reliance by the other party." *Fluke Corporation v. LeMaster*, 306 S.W.3d 55, 62 (Ky.2010) (discussing the elements of an equitable estoppel defense).

■ Here, not only is it doubtful that Ms. Ping "misrepresented" her authority, but even assuming that she did, she is not the party making claims against Beverly. That party is Mrs. Duncan's Estate, and there is no suggestion that either Mrs. Duncan or Ms. Ping in her capacity as representative of the Estate wrongfully induced Beverly to do or to forebear from doing anything. The Estate would be estopped, of course, if Mrs. Duncan were estopped. But under *Restatement (Third) of Agency* § 2.05, a principal may be estopped from disavowing an agent's unauthorized transaction with a third party only if the third party justifiably was induced to make a detrimental change in position because it believed the agent had authority and then only if "(1) the [principal] intentionally or carelessly caused such belief, or (2) having notice of such belief and that it might induce others to change their positions, the [principal] did not take reasonable steps to notify them of the facts." Ms. Ping's assumed misrepresentation of her authority is not be attributed to Mrs. Duncan, then, or her Estate, because Mrs. Duncan neither caused Beverly's mistaken belief about the scope of Ms. Ping's authority, nor failed to correct Beverly's misapprehension after having notice of it. *See Compere's Nursing Home, Inc. v. The Estate of Farish*, 982 So.2d 382 (Miss.2008) (where decedent/principal did nothing to mislead nursing home into believing that agent had authority to agree to arbitration, estate was not estopped from denying his authority); *but see THI of New Mexico at Hobbs Center, LLC v. Patton*, 2012 WL 112216 (D.N.M.2012) (estate estopped from denying alternate agent's authority because of agent's and alternate agent's misleading acts).

■ We agree with the Court of Appeals of Maryland, furthermore, that at least where, as here, the Arbitration Agreement was not a condition of admission, the nursing home has failed to show that its mistaken belief regarding Ms. Ping's authority resulted in the sort of detriment that would support an estoppel. *Dickerson*, 995 A.2d 721. Apparently Mrs. Duncan would have been admitted to Beverly's facility even had there been no mistake, so the only detriment to Beverly is the loss of its bargain to arbitrate. As is noted in comment b. of section 2.05 of the *Restatement*, however, in this context " '[d]etrimental change of position' means an expenditure of money or labor, an incurrence of a loss, or subjection to legal liability, not the loss of the benefit of a bargain." *Restatement (Third) of Agency* § 2.05 comment b. Mrs. Duncan's Estate, in sum, is not estopped from disavowing the Arbitration Agreement.

**E. The Estate is Not Bound to the Arbitration Agreement as a Third Party Beneficiary.**

■ Finally, at oral argument Beverly asserted that the Estate should be bound to the Arbitration Agreement under a third party beneficiary theory. That is a theory of the law of contracts and is an exception to the general rule that only parties to a contract may enforce or be bound by its provisions. The exception comes about when the contracting parties intend by their agreement to benefit some person or entity not otherwise a party. This "third-party beneficiary" may "in his own right and name enforce [the] promise

made for his benefit even though he is a stranger both to the contract and to the consideration." *Presnell Construction Managers, Inc. v. EH Construction, LLC,* 134 S.W.3d 575, 579 (Ky.2004) (citation and internal quotation marks omitted). As the United States Supreme Court recognized in *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 370, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984) (citing *Restatement (Second) of Contracts* § 309, cmt. b (1981); S. Williston, *Contracts* § 395 (3d ed.1959); and 4 A. Corbin, *Contract* § 819 (1951)), the general rule is that a third party beneficiary asserting rights under the contract is subject to any defense that the promisor would have against the promisee. This general rule is widely deemed to extend to arbitration clauses: " '[W]here [a] contract contains an arbitration clause which is legally enforceable, the general rule is that the beneficiary is bound thereby to the same extent that the promisee is bound.' " *Benton v. Vanderbilt University,* 137 S.W.3d 614, 618 (Tenn.2004) (quoting from *Williston on Contracts* § 364 A (3d ed.1957) and collecting cases). The rule has been applied in the nursing home context where, even though the principal/decedent's agent did not have authority to bind the principal as a party to the arbitration clause, the agent entered the admissions agreement not merely as a purported representative but also in his or her individual capacity, and the decedent, and hence the estate, has been deemed bound by the arbitration clause as a third party beneficiary of the contract between the facility and the agent. *Cook,* 786 F.Supp.2d 1166; *Patton,* 2012 WL 112216.

 Here, however, there is no suggestion that Ms. Ping entered the Admissions Agreement on her own behalf as well as that of her mother. Indeed, Beverly does not base its claim on the Admissions Agreement, which was not made a part of the record. The Arbitration Agreement provides that Mrs. Duncan was the intended party with Ms. Ping signing the agreement only in her capacity as power of attorney. We reject Beverly's oral argument contention that Ms. Ping became a party to either agreement merely by virtue of having signed it. In general, as the *Restatement* notes, "[w]hen an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, (1) the principal and the third party are parties to the contract; and (2) the agent is not a party to the contract unless the agent and the third party agree otherwise." *Restatement (Third) of Agency* § 6.01 (2006); *see Potter v. Chaney,* 290 S.W.2d 44, 46 (Ky.1956) ("After the principal is disclosed, the agent is not liable, generally speaking, for his own authorized acts."). Absent evidence of a contrary arrangement, therefore, Ms. Ping, who was authorized to admit her mother to Beverly's facility, did not become a party to the Admissions Agreement, and so her mother cannot be deemed a third party beneficiary of a non-existent agreement between Ms. Ping and Beverly.

 The result is the same with respect to the Arbitration Agreement itself, for although Ms. Ping did not have authority to bind her mother to that agreement, her purporting to do so did not make her a party unless, again, she and Beverly agreed otherwise, which plainly they did not. *Restatement (Third) of Agency* § 6.10 cmt. b ("[A]n agent does not become a party to a contract made on behalf of a disclosed principal unless the agent so agrees with the third party.... Thus, if the principal on whose behalf the agent purports to act is not bound by a contract because the agent acted without actual or apparent authority, the third party may not subject the agent to liability on the contract unless the agent agreed to be-

come a party."). Since there was no contract between Ms. Ping and Beverly of which Mrs. Duncan could have been a third party beneficiary, that theory cannot serve to bind the Estate to the Arbitration Agreement.[5]

In sum, the trial court correctly held that Mrs. Duncan's power of attorney did not authorize her daughter to waive unnecessarily her right to seek redress for injury in court. Since the trial court's denial of Beverly's motion to compel arbitration is to be upheld on this ground, we decline, with one exception, to address the alternative grounds urged by the Estate for denying the motion to compel arbitration.

## II. The Wrongful Death Beneficiaries Are Not Bound By the Arbitration Agreement.

■ The one exception concerns the distinction to be drawn between the survival claims under KRS 411.140, which the

Estate, as Mrs. Duncan's successor, brings on its own behalf, and the wrongful death claim, under KRS 411.130, which the Estate's representative brings not on behalf of the Estate, but on behalf of the statutory wrongful death beneficiaries. The beneficiaries maintain that regardless of whether the Estate is subject to the Arbitration Agreement, that agreement cannot bind them, because they were not parties to it, and because their statutory claim is separate and independent from the claims of Mrs. Duncan. We agree and believe this important issue merits further discussion.[6]

The wrongful death statute, KRS 411.130, provides in pertinent part that [w]henever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it.

5. At oral argument, Beverly seemed to suggest that Ms. Ping, individually, should be held to the Arbitration Agreement as a third party beneficiary of the admissions contract between her mother and Beverly. This suggestion comes to naught, however, because (a) Ms. Ping, individually, is not a party to the suit; (b) as a person interested in her mother's well being, Ms. Ping was an incidental beneficiary of the Admissions Agreement between her mother and Beverly, but since the agreement was not made for her sake, she was not an intended beneficiary of it so as to bring her within the third-party-beneficiary rules, *see Sexton v. Taylor County*, 692 S.W.2d 808 (Ky.App.1985) (discussing the intent necessary to confer third-party-beneficiary status); *Bybee v. Abdulla*, 189 P.3d 40 (Utah 2008) (holding that wife was incidental, not third party, beneficiary of husband's medical treatment); and (c) even if Ms. Ping could be deemed a third party beneficiary of the Admissions Agreement, for the reasons discussed above, the Arbitration Agreement never became a part thereof.

6. As Beverly notes, the wrongful death beneficiaries did not raise this argument before either the trial court or the Court of Appeals,

and our general practice is not to address issues which the trial court was not given an opportunity to consider. *Fischer v. Fischer*, 348 S.W.3d 582 (Ky.2011). We have distinguished, however, between unpreserved arguments in support of the trial court's Judgment and unpreserved claims of error. *Id.* While review of the latter is governed by our palpable error rules and standards, *id.*, we have taken a somewhat more discretionary approach to the former, and have occasionally addressed an unpreserved, purely legal argument supporting a judgment in order to demonstrate an important, independently decisive ground for the trial court's decision or to avoid what could be a misleadingly incomplete statement of the law. *Kentucky Farm Bureau Mutual Insurance Co. v. Shelter Mutual Insurance Co.*, 326 S.W.3d 803 (Ky.2010). We believe that the question of a decedent's ability to require arbitration of a wrongful death claim is of sufficient importance both to this case and to a full statement of the law in this area to warrant review despite the lack of preservation.

This provision is in accord with section 241 of our present Constitution, which, departing from the common law, creates a cause of action for damages against the person or entity wrongfully causing a death. That section authorizes the General Assembly to provide "how the recovery shall go and to whom belong." Pursuant to that constitutional authority, the General Assembly has provided that the wrongful death action "shall be prosecuted by the personal representative of the deceased," and, as pertinent here, that the amount recovered, less certain expenses, "shall be for the benefit of and go to the kindred of the deceased in the following order: ... (c) If the deceased leaves a child or children, but no widow or husband, then the whole to the child or children." KRS 411.130(2)(1974).

The General Assembly has also provided that, with exceptions not pertinent here, "[n]o right of action for personal injury or for injury to real or personal property shall cease or die with the person injuring or injured." KRS 411.140. This is the so-called survival statute, another extension of the common law, and under it a personal injury claim does not lapse upon the death of the injured person, as was the common-law rule, but may be "brought or revived by the personal representative" on behalf of the decedent's estate.

Although in some states the wrongful death action is deemed to be derivative of the personal injury claim, in others the two claims are regarded as independent. *See, e.g., In re Labatt Food Service, L.P.,* 279 S.W.3d 640 (Tex.2009) (derivative); *Peters v. Columbus Steel Castings Co.,* 115 Ohio St.3d 134, 873 N.E.2d 1258 (2007) (independent). Courts in states where the wrongful death action is derivative have held that an arbitration agreement applicable to a personal injury claim applies as well to the wrongful death claim. *Labatt,* 279 S.W.3d 640; *Ballard v. Southwest Detroit Hospital,* 119 Mich.App. 814, 327 N.W.2d 370 (1982). Where the claims are deemed independent, however, courts have held that a person's agreement to arbitrate his or her personal injury claim does not bind the wrongful death claimants to arbitration, because they were not parties to the agreement and do not derive their claim from a party. *Lawrence v. Beverly Manor,* 273 S.W.3d 525 (Mo.2009); *Bybee,* 189 P.3d 40; *Peters,* 873 N.E.2d 1258; *Carter,* 353 Ill.Dec. 422, 955 N.E.2d 1233; *Woodall v. Avalon Care Center–Federal Way, LLC,* 155 Wash.App. 919, 231 P.3d 1252 (2010). *But see Allen v. Pacheco,* 71 P.3d 375 (Colo.2003) (holding that independent wrongful death claim was nevertheless subject to decedent's arbitration agreement); *and see Ruiz v. Podolsky,* 50 Cal.4th 838, 114 Cal.Rptr.3d 263, 237 P.3d 584 (2010) (holding that specific provision in state's medical malpractice Act required arbitration of wrongful death claims where the decedent had agreed to arbitrate any claim arising from medical provider's services.).

In Kentucky, the constitutional status of the wrongful death claim is a strong indication of that claim's independence, *cf. Bybee,* 189 P.3d 40 (construing similar constitutional provision), but we need not invoke the Constitution, because the General Assembly has left no doubt that in this state wrongful death and survival actions are separate and distinct:

It shall be lawful for the personal representative of a decedent who was injured by reason of the tortious acts of another, and later dies from such injuries, to recover in the same action for both the wrongful death of the decedent and for the personal injuries from which the decedent suffered prior to death, including a recovery for all elements of damages

in both a wrongful death action and a personal injury action.

KRS 411.133 (1968). *See also, Moore v. Citizens Bank of Pikeville*, 420 S.W.2d 669, 672 (Ky.1967) (noting that "the wrongful death action is not derivative. . . . [It] is distinct from any that the deceased may have had if he had survived."). Mrs. Duncan, of course (or an *authorized* agent), could have agreed to arbitrate *her* claims against Beverly, and, because a survival action would have asserted *her* claims, the Estate bringing those claims in her stead would likewise have been bound by her agreement. Indeed, Beverly's Arbitration Agreement provides for just that. It purports to bind "all persons whose claim is derived through or on behalf of the Resident." Because under our law the wrongful death claim is not derived through or on behalf of the resident, but accrues separately to the wrongful death beneficiaries and is meant to compensate them for their own pecuniary loss, we agree with the Courts cited above which have held that a decedent cannot bind his or her beneficiaries to arbitrate their wrongful death claim. This then is another reason, at least with respect to the wrongful death portion of the complaint, to uphold the trial court's denial of Beverly's motion to compel arbitration.

In taking issue with this conclusion, Beverly again conflates the different roles Ms. Ping has played and argues that she "agreed [individually] to arbitrate that claim [the wrongful death claim] by executing the [arbitration] agreement." But, of course, she did no such thing. By executing the arbitration contract, Ms. Ping purported to agree on her mother's behalf, not her own, to arbitrate her mother's claims. Even were her mother's agreement valid, Ms. Ping's having executed it as her mother's representative would not preclude Ms. Ping, as representative of the wrongful death beneficiaries, from litigating their entirely separate claim.

Beverly also contends that the wrongful death claimants, as heirs of Mrs. Duncan, are third party beneficiaries of the Arbitration Agreement itself, as opposed to the Admissions Agreement, and as such are bound by its terms. Beverly refers us to that portion of the Arbitration Agreement which provides that "this Arbitration Agreement . . . shall inure to the benefit of and bind the parties . . . and all persons whose claim is derived through or on behalf of the Resident, including . . . executor, legal representative, administrator, or heir of the Resident." This reference to heirs, Beverly asserts, is enough to bind the wrongful death claimants to arbitration. As noted above, however, even had the Arbitration Agreement been validly executed, it would not, and could not, have applied to the wrongful death beneficiaries, because their claim is not "derived through or on behalf of the Resident."

Furthermore, as interesting as life might be if we could bind one another to contracts merely by referring to each other in them, we are not persuaded that a non-signatory who receives no substantive benefit under a contract may be bound to the contract's procedural provisions, including arbitration clauses, merely by being referred to in the contract. It is one thing to say that a third party for whose substantive benefit a contract is made may not enforce his or her rights under the contract without also abiding by the contract's other terms. That is the general third-party beneficiary rule discussed above. It may even be that *tort* claims by such a directly benefitting third party are appropriately subjected to the contract's arbitration provisions, at least where the tort and the contract are significantly intertwined. *See, In re Weekley . Homes, L.P.*, 180 S.W.3d 127 (Tex.2005) (negligent

repair claim by homeowner's daughter against contractor was subject to repair contract's arbitration clause because daughter, although a non-party, was a direct and principal beneficiary under the contract). It is something else entirely, however, to say that incidental beneficiaries of a contract—individuals or entities with no substantive rights under the contract and no direct benefits—may have their tort claims against the parties swept up into the contract's arbitration provisions merely by being mentioned in the contract as potential claimants. This is what Beverly purports to do. Arbitration is a matter of contract, however; it is something the contracting parties, or their proxies, must agree to. It is not something that one party may simply impose upon another. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Citation and internal quotation marks omitted.). Since Beverly's theory would allow just that, *i.e.*, would allow one party merely by referring to someone else in an arbitration clause to thereby bind that other person to arbitration as a "third party beneficiary" of the arbitration agreement, we reject it out of hand.

### CONCLUSION

In sum, because Mrs. Duncan's power of attorney did not authorize her agent, Ms. Ping, to do more than make financial, property-related, and health-care decisions, the trial court correctly determined that the optional Arbitration Agreement the agent purported to execute on Mrs. Duncan's behalf was beyond the scope of the agent's authority and therefore unenforceable against Mrs. Duncan's Estate and wrongful death beneficiaries. In the absence of actual authority, Beverly at-

tempts to establish apparent authority on the part of Ms. Ping but that theory is similarly unavailing. The Estate and the beneficiaries, furthermore, are neither estopped from disavowing the Arbitration Agreement, nor bound to it under third-party beneficiary principles. Finally, the wrongful death claimants would not be bound by their decedent's arbitration agreement, even if one existed, because their statutorily distinct claim does not derive from any claim on behalf of the decedent, and they therefore do not succeed to the decedent's dispute resolution agreements. Accordingly, we reverse the Opinion of the Court of Appeals, and remand this matter to the Franklin Circuit Court for additional proceedings consistent with this Opinion.

All sitting. All concur.