Jean MCCUISTON, as Administrix of
The Estate of Joyce McCuiston,
Appellant

v.

William B. BUTLER and City
of Henderson, Appellees

NO. 2015–CA–001063–MR

Court of Appeals of Kentucky.

JANUARY 6, 2017; 10:00 A.M.

BRIEF FOR APPELLANT: Stephen
M. Arnett, Morganfield, Kentucky

BRIEF FOR APPELLEES: Michael S.
Maloney, Justin M. Schaefer, Louisville,
Kentucky

BEFORE: CLAYTON, STUMBO,
AND VANMETER,[1] JUDGES.

1. Judge Laurence B. VanMeter concurred in this opinion prior to being elected to the Kentucky Supreme Court. Release of this opinion was delayed by administrative handling.

## OPINION

CLAYTON, JUDGE:

Jean McCuiston, as administrix of the estate of Joyce McCuiston (hereinafter "the Estate"), appeals the Henderson Circuit Court's order granting summary judgment to William B. Butler and the City of Henderson, Kentucky (hereinafter "Henderson") in a wrongful death action. After careful consideration, we affirm.

## BACKGROUND

On July 28, 2012 at 7:52 a.m., Joyce McCuiston called 911, and William B. Butler answered the call. He worked for the Henderson's 911 communication center as a dispatcher. Ms. McCuiston made the call from a cell phone to report a non-active theft. Because her speech was slurred and she was very difficult to understand, Butler asked McCuiston several times during the call to confirm both her identity and her address (553 Fairmont Avenue). Since she was using a cell phone, her location was not available on the system.

At the end of the call, Ms. McCuiston advised Butler that she was dehydrated and unable to come to the door. Nonetheless, Ms. McCuiston never requested medical assistance or an ambulance or reported any type of medical emergency. She instructed Butler that when the responder arrived, she would "holler" and say "come in, the door's open." Butler advised her that he would do so and ended the call. But he never relayed this information to the deputy sheriff.

Immediately after ending the call, Butler sent a deputy from the Henderson County Sheriff's Office to 553 Fairmont Avenue, which was an address located outside Henderson in Henderson County. The call was designated a non-emergency call since it was a report of a theft and not a report of a theft-in-progress.

When Deputy Jewely King arrived at the residence, she was not completely certain it was the residence because it was not numbered. Deputy King knocked on the door but received no answer. Next, Deputy King spoke with a neighbor, Barbara Gatewood. Gatewood informed Deputy King that Ms. McCuiston owned the property, but she was in and out, plus no one lived there all of the time. She also told Deputy King that Ms. McCuiston was a severe alcoholic, and if she was awake, she was drunk. Gatewood further added that if Ms. McCuiston called 911, it was likely from a pay phone somewhere.

After speaking with Gatewood, Deputy King called the phone number given in the 911 call but the call was unanswered. She then went to the back door and knocked loudly. Deputy King did not hear any response or other noise from inside the home. She contacted Butler at dispatch and told him that no one answered at 553 Fairmont and that she had been advised by a neighbor that no one lived there. The call was ended. Later, Deputy King admitted that this information was misleading since Gatewood had not told her no one lived at the address.

Nonetheless, Butler relied on the information. After several attempts to determine the caller's name and location, he assumed he had misheard the address. Still, Butler never told Deputy King about McCuiston's instructions at the end of the original 911 call. According to Butler, he did not want to send Deputy King into the wrong residence and risk her life or other people's lives.

Three days later, on July 31, 2012, friends of Ms. McCuiston entered the residence and found her dead. Deputies from the Henderson County Sheriff's Office arrived at the scene to investigate the death. During the investigation, they discovered a prepaid cell phone in plain view on the

coffee table a few feet from Ms. McCuiston's body. After it was turned on, it showed that one of the last calls was to Henderson 911. Deputy King was then questioned. All the information was turned over to the Henderson Police Department. Thereafter, the police department conducted its own investigation.

The Henderson Police Chief was concerned about Butler's handling of the call. Consequently, he recommended that Butler's employment be terminated. Prior to termination, however, Butler, as a civil service employee, was entitled to an administrative hearing before the Henderson Civil Service Commission ("Commission"). He took advantage of this option and appealed the decision to terminate his employment. The Commission held a hearing on September 24, 2012, during which the City argued that Butler should be terminated.

The civil service rules dictated that the Henderson City Attorney was to advise the Commission during the hearing. Thus, outside legal counsel, Chris Hopgood, was hired to represent Henderson for all purposes related to the hearing. At the hearing, Hopgood made an opening argument, presented evidence, and provided a closing argument. During the closing argument, Hopgood asked the Commission to find that Butler had violated several administrative policies and procedures, which contributed to McCuiston's death. Nevertheless, Hopgood did not offer independent facts into evidence or testify under oath or offer any avowal of the facts relevant to the Commission's determination. The Commission found that Butler had violated several regulations, but rather than termination, ordered that he be suspended without pay for six months. .

Besides the law enforcement investigations, Dr. Donna Stewart, the Commonwealth of Kentucky medical examiner, investigated Ms. McCuiston's death. Dr. Stewart performed the autopsy and conducted toxicological analyses of various tissues and fluids obtained during the autopsy. The medical examiner attributed her death to natural causes brought about by a history of uncontrolled hypertension and chronic alcoholism. Further, Dr. Stewart opined that it was not scientifically possible to establish the date and time of death.

On February 26, 2013, the Estate filed suit for wrongful death against both Butler and the City of Henderson. After completing discovery, Butler and Henderson filed a motion for summary judgment arguing that Butler had no duty towards Ms. McCuiston and that his actions did not proximately cause her death. Additionally, Butler and Henderson maintained that even if his actions were a substantial factor in causing her death, Butler was entitled to official immunity for his actions and the case against Henderson should be dismissed for vicarious liability.

On June 18, 2015, the trial court granted the motion for summary judgment. The Estate now appeals this decision.

## STANDARD OF REVIEW

The standard of review of a summary judgment is whether the trial court correctly found that there was no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Norton Hospitals, Inc. v. Peyton*, 381 S.W.3d 286 (Ky. 2012); Kentucky Rules of Civil Procedure (CR) 56.03. Further, we will uphold a summary judgment only if after viewing the evidence in the light most favorable to the party opposing the motion, we conclude that party "could not prevail under any circumstances." *Steelvest v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky.1991). Where, as here, factual findings are not at issue, we review the legal conclusions of the lower courts *de*

*novo. Branham v. Stewart*, 307 S.W.3d 94 (Ky. 2010).

## ANALYSIS

On appeal, the Estate argues that the trial court abused its discretion by failing to acknowledge Hopgood's judicial admissions during the Commission hearing; that equitable estoppel prohibits Henderson from denying liability; that the trial court erred by not allowing the deposition of Hopgood; and, that the trial court erred by concluding Butler was entitled to qualified official immunity.

Butler and Henderson counter that the Estate failed to challenge the trial court's determination that the Estate had not established medical causation; that the trial court properly held that Hopgood's arguments at the Commission hearing did not constitute judicial admissions; that equitable estoppel has no application in this case; and, that the trial court correctly decided that Butler was entitled to qualified official immunity.

### Wrongful Death

This case is a wrongful death action. It is authorized by Kentucky Revised Statutes (KRS) 411.130, which provides that a wrongful death action may be brought by a representative of a decedent "[w]henever the death of a person results from an injury inflicted by the negligence or wrongful act of another" for damages against the person or agent who caused the death. This provision is in accord with section 241 of our present Constitution, which, departing from the common law, creates a cause of action for damages against the person or entity wrongfully causing a death. *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 598 (Ky. 2012).

Because a wrongful death action is a tort, it is necessary to prove that a party was negligent to receive relief under the statute. *Saylor v. Hall*, 497 S.W.2d 218, 222 (Ky. 1973). Generally, to make a claim of negligence, a party must establish that there is a recognized duty, a breach of that duty, and a resulting injury. Proof of each element is absolutely necessary. *Com., Transportation Cabinet, Department of Highways v. Guffey*, 244 S.W.3d 79, 81 (Ky. 2008). With this framework in mind, we turn to the matter at hand.

### 1) Duty

In the motion for summary judgment, Butler and Henderson maintained that Butler did not have a legal duty to Ms. McCuiston; however, the trial court determined based on the "special relationship" doctrine that Butler did have such a duty to Ms. McCuiston. On appeal, Butler and Henderson do not contest that Butler had a special duty to Ms. McCuiston.

Nonetheless, since our review involves legal issues, and hence, is *de novo*, and whether duty exist is a question of law, we address this issue. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). When a public official is involved, Kentucky courts use the "relationship doctrine" to determine whether a duty is owed. *City of Florence, Kentucky v. Chipman*, 38 S.W.3d 387, 393 (Ky. 2001).

The public duty doctrine was elucidated in *Ezell v. Cockrell*, 902 S.W.2d 394, 397 (Tenn. 1995):

> The public duty doctrine originated at common-law and shields a public employee from suits for injuries that are caused by the public employee's breach of a duty owed to the public at large. Kelly M. Tullier, *Governmental Liability for Negligent Failure to Detain Drunk Drivers*, 77 Cornell L.Rev. 873, 886 (1992). The doctrine can be traced to the United States Supreme Court's decision in *South v. Maryland*, 59 U.S. (18 How.) 396, 15 L.Ed. 433 (1855), which

held that a sheriff is not liable for failing to protect a kidnap victim because the sheriff's duty to keep the peace was "a public duty, for neglect of which he is amenable to the public, and punishable by indictment only." *Id.* at 403.

Quoting *Ezell*, the *Chipman* court noted its agreement and stated:

[P]ersons who serve the public must be allowed to carry out their function without fear of having to answer for harm caused to an individual by events which are outside the control of the public official. Public officials are not an insurer of the safety of every member of the public, nor are they personally accountable in monetary damages only because the individual is a public official charged with a general duty of protecting the public.

*Chipman*, 38 S.W.3d at 393.

The rationale behind the public duty doctrine is that to impose a universal duty of care on public officials would severely reduce their ability to engage in discretionary decision-making on the spot. *Id.* Because 911 operators serve the public, their actions are also encompassed under the public duty doctrine.

Other jurisdictions have similarly elaborated on the public duty doctrine. For example, in Washington State, the courts hold that the public duty doctrine requires that the plaintiff seeking recovery from a public entity or government employee demonstrate a breach of duty owed to the individual plaintiff, not "the breach of a general obligation owed to the public in general, *i.e.*, a duty owed to all is a duty owed to none." *Beal v. City of Seattle*, 134 Wash.2d 769, 784, 954 P.2d 237 (1998). Hence, under the public duty doctrine, recovery from a public official in tort is possible only where the victim shows that the duty breached was owed to an individ-

ual, and was not the breach of a general obligation owed to the public in general.

The "public duty" doctrine reinforces the proposition that to impose a duty of care on a public official, there must exist a "special relationship" between the party and the public officer, the public officer does not have a duty to a particular individual. In the case at bar, for the Estate to establish a duty on Butler's part, the Estate must show that Butler's actions created a special relationship between him and Ms. McCuiston."

And in Kentucky, that duty is only established by showing that the public official and the party were engaged in a special relationship. In *Fryman v. Harrison*, 896 S.W.2d 908 (Ky. 1995), and other cases, Kentucky Courts have determined that public officials are not guarantors of public safety and, as such, do not have a duty of universal care to protect the general public from harm or accident.

The special relationship test was explained in *Fryman* when the Court stated that "[i]n order to establish an affirmative legal duty on public officials in the performance of their official duties, there must exist a special relationship between the victim and the public officials." *Id.* at 910. To reiterate, there must be a special duty owed by the public official to a specific, identifiable person and not merely a breach of a general duty owed to the public at large. *Id.*

*Fryman* developed a two-prong test demonstrating a "special relationship, which was also elucidated in *Chipman.* Initially, it observed that "for a claim to be actionable in negligence, there must be the existence of a duty and unless a special relationship was present, there is no duty owing...." *Chipman*, 38 S.W.3d at 392. The Court continued that to establish a special relationship, it is necessary to demonstrate that "(1) the victim must have

been in state custody or otherwise restrained by the state at the time the injury producing act occurred, and (2) the violence or other offensive conduct must have been committed by a state actor." *Id.*

In *Chipman*, the Court ruled that the foreseeability of the harm is not a factor in whether a duty is owed. "Foreseeability does not create a duty. Rather, duty can only be created by showing the existence of a special relationship[.]" *Id.* at 393. Finally, the Court explains that "[f]oreseeability of harm arises only after the establishment of the existence of a duty. *Id.*

More recently, the Kentucky Supreme Court revisited the "special relationship" doctrine in *Gaither v. Justice & Public Safety Cabinet*, 447 S.W.3d 628 (Ky. 2014). The facts of the case involved the recruitment by the police of a confidential informant, Gaither, to help in procuring evidence in drug cases. Gaither was murdered for helping the police. On appeal from another panel of this Court, the Supreme Court deviated from the two-pronged "special relationship" test originally articulated in *Fryman* and applied in *Chipman*, and expanded the parameters of a "special relationship" test, to hold that in this particular case, that the police officers did owe a duty of ordinary care to Gaither. *Id.* at 639.

The Court held that the two-prong "special relationship test" articulated in *Fryman* established a legal duty of a state actor when he and the victim are in a special relationship based on the unique circumstances of a case. *Gaither* reasoned that the *Fryman* test was too narrow in its circumstances. *Id.* at 638. The Court reasoned that the *Fryman* test did not capture the occasions in which a negligent government official should reasonably foresee that his negligence was likely to put a specific individual in harm's way at

the hands of a specifically-known and identifiable third party. *Id.* In this decision, the Court noted specifically that the *Fryman* test was ill-suited to the circumstances of a confidential police informant actively engaged in an undercover operation with police officers. *Id.* Still, *Gaither* did not extend its holding beyond the relationship between police officers and confidential informants.

Consequently, the Court ruled that by recruiting a confidential informant, the police formed a "special relationship" with the informant even though he was not in state custody or harmed by a state actor. *Id.* The special relationship was the one formed between a confidential informant and his police supervisors during an ongoing undercover operation.

Since the *Gaither* Court phrased its holding about a "special relationship" in the context of the unique circumstances of that case, the question arises whether the reasoning in *Gaither* can be extended to other matters, and in particular, to this case—the relationship between a 911 dispatcher and a caller. The trial court answered it did.

The trial court reviewed *Fryman*, *Chipman*, and ultimately *Gaither*. The trial court observed that in *Gaither*, the Court, in discussing *Fryman*, believed that foreseeability and the lack of foreseeability were the compelling factor behind the prongs in the "special relationship" test. In other words, harm was foreseeable if the victim was in the state's custody and the harm was committed by a state actor. But the trial court opined that the narrowness of the *Fryman* test was not broad enough to encompass the *Gaither* facts, as the *Fryman* test would only capture occasions where the harm was foreseeable to the victim while in state custody.

The trial court then related that American courts have addressed the issue of whether a 911 operator has a duty in various ways. Some courts have held that the creation of a 911 service establishes a "special relationship" or duty to its callers, either by itself or when the caller detrimentally relies on the dispatcher's assurances of help. *See Delong v. County of Erie*, 89 A.D.2d 376, 455 N.Y.S.2d 887 (N.Y. 1982). Other courts have found that a telephone call for assistance was not sufficient to create a duty to the caller. *Warren v. District of Columbia*, 444 A.2d 1 (D.C. 1981).

Then, without articulating any analysis that established the reason that the trial court believed that a "special relationship" existed in this matter, the trial court opined that after its review of *Chipman*, *Fryman*, and *Gaither*, it was more persuaded that 911 dispatchers have duty to callers beyond that owed to the public at large. Therefore, under the trial court's reasoning, every 911 dispatcher would have a "special relationship" with every caller.

▆▆▆ We disagree with the conclusion that Butler had a "special relationship" with Ms. McCuiston, and therefore, a legal duty to her.[2] Moreover, we do not believe under the *Fryman*, *Chipman*, and *Gaither* analyses, our Courts have extend the "special relationship" to all calls to 911 dispatchers.

In *Gaither*, the Court clarified that "[t]he 'special relationship' rule was developed in the context of injuries suffered by members of the general public disassociated with and far removed from negligent acts that allegedly caused their injuries." *Gaither*, 447 S.W.3d at 637–38. In this case, however, Butler only acted in the prescribed manner for a 911 dispatcher and performed his responsibilities in the typical manner. In other words, he did nothing beyond his public job responsibilities that would create a "special relationship" with Ms. McCuiston.

Moreover, the *Gaither* Court cautioned against applying "a rule based upon the lack of a foreseeable injury in a case where the injury was uniquely foreseeable" and where "a state agency actually created a connection with the injured claimant, and then repeatedly fostered the continuation of that relationship." *Id.* at 638.

Here, the Estate cannot establish that Butler, outside his role as a 911 dispatcher, created a connection with Ms. McCuiston and repeatedly fostered the continuation of that relationship. Instead, he performed his regular duties, took the call, and sent help in a non-emergency situation. Butler never created a "special relationship" with Ms. McCuiston where her death was uniquely foreseeable based on the connection with the 911 dispatcher.

Instead, Ms. McCuiston can appropriately be classified as a member of the general public with whom Butler interacted as a 911 dispatcher. Without a special relationship, Butler's action fell under the "public duty" doctrine, which does not make public officials guarantors of public safety with a universal duty of care to protect the general public from harm or accident. Butler did not establish a "special relationship" with Ms. McCuiston, and therefore, he did not have a duty of care to her and was protected from liability by the public duty doctrine. Without any legal duty, there can be no wrongful death action. Although Ms. McCuiston's death is a

---

**2.** "[A]n appellate court may affirm a trial court for reasons other than those relied on by the trial court, so long as such is sustaina- ble under the record[.]" *Brewick v. Brewick*, 121 S.W.3d 524, 527 (Ky. App. 2003).

tragedy, it is not one for which Butler or the City of Henderson can be held liable.

Having determined that Butler had no special relationship with Ms. McCuiston, and thus, cannot be liable in a wrongful death action, the remaining issues are rendered moot.

## CONCLUSION

Since Butler had no legal duty to Ms. McCuiston, the grant of summary judgment was proper since no genuine issues of material fact exist and the moving party is entitled to a judgment as a matter of law. Accordingly, we affirm the Henderson Circuit Court for reasons other than those upon which it relied.

ALL CONCUR.