CORRECTED: NOVEMBER 22, 2017
RENDERED: NOVEMBER 2, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2013-SC-000431-I

DATE 11/27/17 Kim Rochman, DC

KINDRED NURSING CENTERS LIMITED
PARTNERSHIP D/B/A WINCHESTER
CENTRE FOR HEALTH AND
REHABILITATION N/K/A FOUNTAIN
CIRCLE HEALTH AND REHABILITIATION;
KINDRED NURSING CENTERS EAST, LLC;
KINDRED HOSPITALS LIMITED
PARTNERSHIP; KINDRED HEALTHCARE,
INC.; AND KINDRED HEALTHCARE
OPERATING, INC.

APPELLANTS

ON REMAND FROM THE UNITED STATES SUPREME COURT
V.                           CASE NO. 16-32
CLARK CIRCUIT COURT CASE NO. 10-CI-00472

BEVERLY WELLNER, INDIVIDUALLY AND
ON BEHALF OF THE ESTATE OF JOE P.
WELLNER, DECEASED, AND ON BEHALF
OF THE WRONGFUL DEATH
BENEFICIARIES OF JOE P. WELLNER

APPELLEE

**OPINION OF THE COURT BY JUSTICE VENTERS**

This matter is before the Court on remand pursuant to the opinion of the

United States Supreme Court in *Kindred Nursing Centers Ltd. Partnership v.*

*Clark,* 137 S. Ct. 1421 (2017). The case initially came to this Court as three

separate actions which we consolidated into a single opinion styled *Extendicare*

*Homes, Inc. v. Whisman*, 478 S.W.3d 306 (Ky. 2015).[1] Extendicare Homes, Inc., did not seek review by the United Stated Supreme Court, and so our disposition of its case, No. 2013-SC-000426-I, *Extendicare Homes, Inc. v. Whisman* became final. Without Extendicare Homes as a party to the United States Supreme Court action, the case went forward with *Kindred* identified as the Appellant. To avoid confusion, we refer to the final decision of this Court as "*Extendicare*" and the decision of the United States Supreme Court as "*Kindred.*"

Among other holdings, *Extendicare* held that an attorney-in-fact did not have the authority to bind his principal to a pre-dispute arbitration agreement unless that authority was clearly stated in the power-of-attorney document. In *Kindred*, the Supreme Court dubbed this the "clear statement rule," and for convenience and consistency we accept that term as a useful name. As articulated in *Extendicare*, we set forth the clear statement rule as a more specific application of the general rule stated in *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581 (Ky. 2012).[2] We said in *Extendicare*:

> [*Ping*] cautioned . . . that given the 'significant legal consequences' arising from an agreement waiving the principal's rights of access to the courts and to trial by jury, 'authority to make such a waiver is not to be inferred lightly.' Our holdings throughout this opinion, as in *Ping* itself, serve to highlight our reservation about casually inferring a power laden with such consequences.

---

[1] The three cases are: No. 2013-SC-000426-I, *Extendicare Homes, Inc., v. Whisman*; No. 2013-SC-000430-I, *Kindred Nursing Centers Limited Partnership v. Clark*; and No. 2013-SC-000431-I, *Kindred Nursing Centers Limited Partnership v. Wellner.*

[2] *Cert. denied*, ___ U.S. ___, 133 S. Ct. 1996 (2013).

2

478 S.W.3d at 327 (quoting *Ping*, 376 S.W.3d at 593).

Kindred Nursing Centers challenged the "clear statement rule" by petitioning the United States Supreme Court for a writ of certiorari. The writ was granted and the Supreme Court ultimately concluded that our adoption of the clear statement rule, insofar as it affected Kindred's pre-dispute arbitration agreement, impinged upon the supremacy of the Federal Arbitration Act. Our ruling in the case of *Kindred Nursing Centers Ltd. Partnership v. Clark* turned exclusively upon the clear statement rule, and so the Supreme Court's decision reversed it. However, our ruling in the associated case of *Kindred Nursing Centers Ltd. Partnership v. Wellner* also rested upon alternative grounds. Uncertain about whether we had incorporated the clear statement rule into the alternative basis for the *Wellner* decision, the Supreme Court remanded that case for us to determine whether the alternate grounds for our holding with respect to the Wellner POA was "wholly independent" of the clear statement rule. The Supreme Court said:

> The Kentucky Supreme Court began its opinion by stating that the Wellner power of attorney was insufficiently broad to give Beverly the authority to execute an arbitration agreement for Joe. *If that interpretation of the document is wholly independent of the court's clear-statement rule, then nothing we have said disturbs it. But if that rule at all influenced the construction of the Wellner power of attorney, then the court must evaluate the document's meaning anew.* The court's opinion leaves us uncertain as to whether such an impermissible taint occurred. On remand, the court should determine whether it adheres, in the absence of its clear-statement rule, to its prior reading of the Wellner power of attorney [POA].

*Kindred*, 137 S. Ct. at 1429 (internal citations omitted) (emphasis added). So, the question that *Kindred* presents to us on remand is this:

3

**Was our interpretation that the Wellner POA did not authorize attorney-in-fact Beverly Wellner to execute Kindred's pre-dispute arbitration agreement wholly independent of, and not impermissibly tainted by, the clear statement rule?**

The Supreme Court directed on remand that we "evaluate the document's meaning anew" *only* if our original construction of the Wellner POA was "impermissibl[y] taint[ed]" by, or not "wholly independent of," our subsequent adoption of the "clear statement rule." It follows that if our construction of the Wellner POA was "wholly independent of [the] clear-statement rule, then nothing [in *Kindred*] disturbs it." *Id.*[3]

Our ruling in *Extendicare* relating to Kindred's demand for arbitration of the Wellner claim was based upon two alternative grounds. First, we concluded that neither of the two POA provisions relied upon by Kindred gave the agent, Beverly Wellner, the authority to execute on behalf of her principal, Joe Wellner, a pre-dispute arbitration agreement. Second, we applied the ill-fated clear statement rule. The Supreme Court was "uncertain" about whether the second alternative unduly influenced our reasoning in deciding the first alternative. The premise behind the Supreme Court's uncertainty seems to be its perception that our application of the clear statement rule, rather than the

---

[3] Kindred Nursing Centers did not challenge our construction of the Wellner POA beyond its criticism of the clear statement rule. Kindred's petition for a rehearing and its petition for a writ of certiorari instead focused exclusively on the clear statement rule, which it described as "a newly-created rule of law disfavoring enforcement of agent-created arbitration agreements." The failure of any party to challenge our construction of the Wellner POA except in the special circumstance identified by the Supreme Court precludes further *de novo* reconsideration. Accordingly, we do not review our original interpretation of the Wellner POA *ab initio*. By the explicit terms of the Supreme Court's mandate, if our original interpretation of the Wellner POA was wholly independent of the clear statement rule, then it must stand as the final decision of this Court.

4

manifestation of our profound respect for the right of access to the Court of Justice explicitly guaranteed by the Kentucky Constitution and the right to trial by jury designated as "sacred" by Section 7 of the Kentucky Constitution, demonstrated instead a hostility to federal policies implicit in the Federal Arbitration Act and a resulting aversion to any implication of authority to make an arbitration agreement.

So, we explain that aspect of our *Extendicare* decision to demonstrate its purity from the taint of anti-arbitration bias. As a frame of reference for whether our interpretation of the breadth and scope of the Wellner POA was unduly influenced by the clear statement rule, we begin with a glance at the Clark POA. We concluded that the universally broad and vague language employed in the Clark POA,[4] without any express reference to the waiver of the rights of access to the courts and jury trials, nevertheless did indeed vest the principal's attorney-in-fact with authority to execute a pre-dispute arbitration agreement. We held that the Clark POA authorized the agent's execution of Kindred's pre-dispute arbitration agreement despite the absence of a clear statement to that effect; only the application of the clear statement rule avoided that result. Obviously, nothing even close to a "clear statement" was needed in the Clark POA to authorize the agent to waive her principal's fundamental constitutional right of access to the courts and a jury trial. That power, we said, would be implied from the vague and all-encompassing language of the Clark POA. The concern that, because of some residual influence of the clear

---

4 The Clark POA granted the powers "to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way" and "generally to do and perform for me in my name all that I might if present."

5

statement rule, we are averse to inferring the authority to execute an arbitration agreement dissolves upon recognizing that we inferred exactly that authority in the Clark matter. *See Extendicare,* 478 S.W.3d at 327.

Turning now to our interpretation of the Wellner POA's specific language, we note again that Kindred relied upon only two provisions of the Wellner POA as authority for Beverly Wellner's execution of Kindred's pre-dispute arbitration agreement: 1) the power "to demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefor)"; and, 2) the power "to make, execute and deliver deeds, releases, conveyances and contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance." *Id.* at 325.[5]

At this point it is worth recalling that the "act" of Wellner's agent which required authorizing language from the POA document was not the enforcement, through legal proceedings or otherwise, of something then due or to become due to Joe Wellner; nor was it the making of a contract or instrument pertaining to any of Joe Wellner's property. The "act" that required authorization was signing an agreement which makes no reference at all to Joe's property and instead pertains exclusively to his constitutional rights.

Our construction of the two cited provisions of the Wellner POA issues was clear and logical and, in opposition to the clear statement rule, expressed a

---

[5] Whether other provisions of the Wellner POA would support Kindred's position is beyond the scope of appellate review. *Garland v. Commonwealth,* 458 S.W.3d 781, 785 (Ky. 2015) ("Arguments not pursued on appeal are deemed waived.").

willingness to infer in proper cases the power to commit to arbitration even where that express authority was lacking. With respect to the powers to "demand, sue for, collect, recover and receive all . . . demands whatsoever" and "to institute legal proceedings," it should be noted that our *Wellner* analysis incorporated by direct reference our analysis of the similar language of the *Whisman* POA. We said without reservation that "the power to 'institute or defend suits concerning my property rights' would necessarily encompass the power to make litigation-related decisions within the context of a suit so instituted, *including the decision to submit the pending dispute to mediation or arbitration.*" *Id.* at 323 (emphasis added). Despite the lack of a clear statement authorizing the waiver of the principal's fundamental rights of access to the courts and to a jury trial, we expressly held that the power to bind existing claims to arbitration would be inferred from the "institute suits" provision of the *Wellner* POA. Far from being tainted by an association with the clear statement rule, that holding is antithetical to the clear statement rule.

The distinction we made with respect to the *pre-dispute* arbitration agreement was not based at all on any aversion to an implied, rather than an express, power to waive constitutional rights. Beverly Wellner did not execute Kindred's optional free standing pre-dispute arbitration agreement within the context of a lawsuit or claim for the recovery of anything belonging to Joe Wellner. The act that required supporting authorization was her execution of the pre-dispute arbitration agreement in the context of admitting him to a

7

nursing home.[6] That act was in no way connected to the pursuit of any claim of Joe's. Rather than an insistence upon a clear statement, we rejected Kindred's argument simply because the act of executing a pre-dispute arbitration agreement upon admission to a nursing home had nothing at all to do with "demand[ing], su[ing] for, collect[ing], recover[ing] and receiv[ing] all . . . demands whatsoever" and "institut[ing] legal proceedings," and even settling existing claims by arbitration or litigation. *Id.* at 325.

As to our construction of the power to make contracts "in relation to both real and personal property," we explicitly recognized that "a personal injury claim is a chose-in-action, and therefore constitutes personal property." *Id.* at 325-326. Notwithstanding the absence of a clear statement authorizing arbitration, we straightforwardly held that the power to make contracts relating to personal property authorizes the agent to arbitrate the principal's personal injury claim. Here, too, our disagreement with Kindred has nothing to do with the concept of the clear statement rule that the authority to waive the constitutional rights of another person must be clearly stated. Rather than any reliance upon the clear statement rule, our decision with respect to this provision of the POA was based exclusively upon the clear fact that Kindred's pre-dispute arbitration contract did not relate to any property rights of Joe Wellner. It did not buy, sell, give, trade, alter, repair, destroy, divide, or otherwise affect or dispose of in any way any of Joe Wellner's personal property. By executing Kindred's pre-dispute arbitration agreement, Beverly

---

[6] We note that Kindred's optional pre-dispute arbitration agreement was a completely free-standing instrument, fully independent of and not conditioned upon the separate nursing home admission contracts. *See Extendicare,* 478 S.W.3d at 318.

did not "make, execute and deliver deeds, releases, conveyances and contracts of [any] nature in relation to [Joe's] property." The only "thing" of Joe Wellner's affected by the pre-dispute arbitration agreement was his constitutional rights, which no one contends to be his real or personal property. *Id.*

Not a scintilla of our original analysis of the Wellner POA rested upon the premise that the authority to waive constitutional rights (or the corresponding authority to arbitrate a claim) must be clearly stated. Moreover, our analysis clearly expressed the opposite—that whenever reasonably consistent with the principal's expressed grant of authority, we would infer without a clear statement the power to bind him to an arbitration agreement. Kindred's agreement failed, not because the Wellner POA lacked a clear statement referencing the authority to waive Joe's fundamental constitutional rights; it failed because, by its own specific terms it was not executed in relation to any of Joe Wellner's property, and it was not a document pertaining to the enforcement of any of Joe's existing claims.

As established by the rationale plainly stated in *Extendicare*, our conclusion that the Wellner POA was insufficient to vest Beverly Wellner with the power to execute a pre-dispute arbitration agreement as part of Joe Wellner's admission to a nursing home was wholly independent of the clear statement rule decried by the United States Supreme Court. Therefore, as stated by the United States Supreme Court, that aspect of the *Extendicare* decision remains undisturbed.

All sitting. Cunningham, Keller, and Wright, JJ., concur. Hughes, J., dissents by separate opinion in which, Minton, C.J., and VanMeter, J., join.

9

HUGHES, J., DISSENTING: I respectfully dissent because I believe that the majority has failed to follow the United States Supreme Court's directive in the penultimate paragraph of its decision forcefully reversing the original majority opinion in this case. That directive states:

> The Kentucky Supreme Court began its opinion by stating that the Wellner power of attorney was insufficiently broad to give Beverly the authority to execute an arbitration agreement for Joe. See *supra*, at 3. If that interpretation of the document is wholly independent of the court's clear-statement rule, then nothing we have said disturbs it. *But if that rule at all influenced the construction of the Wellner power of attorney, then the court must evaluate the document's meaning anew. The court's opinion leaves us uncertain as to whether such an impermissible taint occurred.* We therefore vacate the judgment below and return the case to the state court for further consideration. See *Marmet Health Care Center, Inc. v. Brown*, 565 U.S. 530, 534 (2012) (*per curiam*) (vacating and remanding another arbitration decision because we could not tell "to what degree [an] alternative holding was influenced by" the state court's erroneous, arbitration-specific rule). On remand, the court should determine whether it adheres, in the absence of its clear-statement rule, to its prior reading of the Wellner power of attorney.

*Kindred Nursing Ctrs, Ltd Partnership v. Clark*, 581 U.S. ___, 137 S. Ct. 1421, 1429 (2017) (emphasis supplied). Prior to issuing this directive, the Supreme Court noted that this Court had "flouted the FAA's command to place [arbitration] agreements on an equal footing with all other contracts." *Id.* This Court's distinction between pre-dispute arbitration agreements as not pertaining to a principal's property rights but rather only his constitutional jury right *vis-à-vis* post-dispute (or perhaps active dispute) arbitration agreements, which they concede necessarily affect property rights, is simply another attempt to single out arbitration for "hostile" treatment under the guise of Kentucky contract and agency law.

10

An arbitration agreement, regardless of when signed or whether characterized as pre- or post-dispute, has absolutely no reason to exist unless there is a current or potential claim to be pursued or defended against. If there is never a claim, the agreement has no purpose—it just sits there as an executed document/contract clause of no real consequence. An arbitration agreement, whether freestanding or part of a broader contract, derives its entire meaning from the fact that the signatories may have or do have a dispute and they agree on the forum for disposing of that claim, whenever it arises. Indeed, the first sentence of the arbitration agreement at issue ("Arbitration Agreement") states:

> Any and all claims or controversies arising out of or in any way relating to this ADR Agreement ("Agreement") or the Resident's stay at the Facility including disputes regarding interpretation of this Agreement, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties (including, without limitation, any claim based on violation of rights, negligence medical malpractice, any other departure from the accepted standards of health care or safety or the Code of Federal Regulations or unpaid nursing home charges), irrespective of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to alternative dispute resolution as described in this Agreement.

The subjects of this first sentence are plainly "claims and controversies."

The particular provision of the Wellner POA that, in my view, authorizes the agent to sign an arbitration agreement, even pre-dispute, is the power "to make, execute and deliver deeds, releases, conveyances and *contracts of every nature in relation to both real and personal property*, including stocks, bonds, and insurance." In the original opinion of this Court ("*Extendicare*"), the majority noted that property in Kentucky has been broadly construed to

11

include things that are tangible and intangible, visible or invisible, "real or personal, choses in action as well as in possession, *everything which has an exchangeable value, or which goes to make up one's wealth or estate.*" 478 S.W.3d at 326 (emphasis in original) citing *Commonwealth v. Kentucky Distilleries & Warehouse Co.,* 136 S.W.1032, 1037 (Ky. 1911). The Court acknowledged that a personal injury claim is a chose-in-action and therefore constitutes personal property. *Id.* at 325-26 citing *Button v. Drake,* 302 Ky. 517, 195 S.W.2d 66, 69 (1946). The majority then reasoned that, nonetheless, a pre-dispute arbitration agreement is not about property rights but rather constitutional rights.

> Joe's personal injury claim was personal property and Beverly had the authority to make contracts relating to it. But the Kindred pre-dispute arbitration agreement was not a contract made "in relation" to a property claim. The agreement did *nothing* to affect any of Joe's property or his property rights. The arbitration agreement does not even purport to be a "contract . . . in relation to both real and personal property." As clearly expressed within the agreement itself, the agreement was made in relation to Joe's constitutional right to access the courts and to trial by jury. Constitutional rights are decisively *not* "personal property" as we have defined the term. They are not "money, goods, chattels, things in action, and evidences of debt;" nor do they have "an exchangeable value, or which goes to make up one's wealth or estate."

(Footnote omitted). *Id.*

But, of course, an arbitration agreement *is* about property rights because without a claim regarding such rights it has no meaning or purpose. See the first sentence of the Arbitration Agreement quoted *supra.* The majority's view of arbitration as contrary to the "sacred" right to a jury trial (a point which it continues to emphasize in the current majority) clearly underlies its willingness to divorce an arbitration agreement from the reality of what it is and what it

12

does.  An arbitration agreement is plainly a contract "in relation to . . . personal property."

The current majority opinion attempts to show its "purity from the taint of anti-arbitration bias" by noting that the Clark POA had "vague and all-encompassing language" and, consequently, the *Extendicare* majority concluded that Clark's agent was vested with authority to execute even a pre-dispute arbitration agreement.  So, a power "to transact, handle and dispose of all matters affecting me and/or my estate in any possible way" and "generally to do and perform for me in my name all that I might if present" is sufficient.  But under the former and current majority's view a broad power "to make . . . contracts of every nature in relation to both real and personal property" is insufficient.  This is the exact language from the Wellner POA and so is the following:

> I hereby further grant unto my Attorney-in-Fact full power in and concerning the above premises and to do any and all acts as set forth above as fully as I could do if I were personally present, and at my decease to pay, transfer and deliver over to my personal representative, all principal and income then in his possession and control, and I do ratify and confirm whatever my said Attorney-in-Fact shall lawfully do under these presents, provided however, that my attorney shall not bind me as surety, guarantor for accommodation nor give away any of my estate, whatsoever, nor shall my attorney be authorized to accept service of process for or on my behalf. . . .

478 S.W.3d at 319-20.[7]

The only response offered to this language, language that is both specific as to contracts of every nature affecting property and broad as to general

---

[7] To state the obvious, it would be very difficult for an agent to discern the limits on his or her authority that today's majority readopts and restates.

powers, is the unfounded premise that an arbitration agreement is not about property rights, just the waiver of a constitutional right. Given how that premise ignores the reality of what an arbitration agreement is, why it exists and what it relates to, I firmly believe the analysis of the Wellner POA is impermissibly tainted by the same anti-arbitration bias as the so-called "clear statement rule."

Addressing the clear statement rule in *Kindred Nursing Centers*, 137 S. Ct. 1427, the U.S. Supreme Court held that it was "too tailor-made to arbitration agreements . . . to survive the FAA's edict against singling out those contracts for disfavored treatment." Justice Kagan noted wryly that the Kentucky Constitution protects property rights and speech rights but no one was suggesting that the "broader" constitutional rule adopted by the *Extendicare* majority would realistically apply to prevent an agent from selling her principal's furniture or signing a non-disclosure agreement unless those particular constitutional rights were addressed expressly in the POA. *Id.* The ensuing short passage deserves careful consideration:

> [T]he [Kentucky Supreme] court hypothesized a slim set of both patently objectionable and utterly fanciful contracts that would be subject to its rule: No longer could a representative lacking explicit authorization waive her "principal's right to worship freely" or "consent to an arranged marriage" or "bind [her] principal to personal servitude." Placing arbitration agreements within that class reveals the kind of "hostility to arbitration" that led Congress to enact the FAA. And doing so only makes clear the arbitration-specific character of the rule, much as if it were made applicable to arbitration agreements and black swans.

*Id.* at 1427-28 (citations and footnote omitted). In my view, today's holding returns to black swan territory by a different route. The narrow focus on the constitutional jury right to the exclusion of the reality of an arbitration

14

agreement returns us to the realm of "utterly fanciful contracts" where arbitration agreements exist in a vacuum independent of disputes and property rights.

Arbitration has received its fair share of criticism and some of it is fully justified but adopting the majority's artificial distinctions regarding language in POAs is a dangerous way to combat the perceived dangers of arbitration. What happens after the issuance of this majority opinion in the following everyday scenarios?

An aging principal let it be known that he did not want to leave his home of forty years, a multi-level residence that cannot accommodate his current needs. His daughter, as agent under his POA, wants to enter into a construction contract to make the needed modifications so he can stay in his home but all the local contractors' construction contracts have arbitration clauses. Can she sign such an agreement with a pre-dispute arbitration clause? If she does and a dispute arises with the contractor, is the arbitration clause enforceable by either party to the contract? If the arbitration clause is not enforceable, does it invalidate the entire construction contract? The daughter is also looking for around-the-clock care, including the provision of meals, for her father. All the local in-home care agencies require a signed contract. Those contracts also have arbitration clauses. Can she execute one and, if she does, what happens if there is a dispute as to billing or quality of care? These contracts, for construction and in-home care, were signed pre-dispute and under the majority's view the arbitration clauses were never about property rights but rather solely constitutional rights not covered by the power

15

to "make . . . contracts of every nature in relation to both real and personal property." So, what happens?

Another principal is a shareholder in a closely-held, third generation family business. She, her siblings and several cousins own all the stock. Her son is agent under her POA and, due to her incapacity, he has been approached by his aunt and uncle (his mother's sister and brother) about signing a voting and buy-sell agreement with them and one of the cousins. They are worried about the direction two out-of-state shareholders (also the principal's cousins) seem to be charting and they know if they vote together and agree to offer their stock to each other if and when they decide to sell, the company can stay on the track earlier generations intended. Can the son sign the agreement if it contains an arbitration clause requiring the signatories to arbitrate any disputes among themselves as to, say, the value of the stock? If he does sign, is it at all enforceable? Suppose everyone looks the other way at the legality and they proceed to arbitration. After the principal's death, can the executor challenge the son's actions and the arbitration award as not authorized?

These scenarios are not even the more likely instances where confusion will occur from the majority's holding. The principal's homeowner's insurance policy needs to be renewed. The principal rents an apartment and her lease is due for renewal. The principal has few assets but unexpectedly receives a sizeable inheritance, so the agent wants to open an account with a conservative stock brokerage company. All these contracts have arbitration clauses. If the agents execute them, are the contracts themselves invalid or just the arbitration clause? Perhaps the majority would conclude that none of these

16

pose a problem because the arbitration clause is embedded in a "contract in relation to" either real or personal property. If that's the case, are only freestanding pre-dispute arbitration agreements verboten under the POA? And why is that? The freestanding arbitration agreement, liked the embedded clause, has no purpose other than to identify the forum for the parties to settle disputes about property interests. It is a "contract . . . in relation to . . . personal property."[8]

Additionally, the majority places great emphasis on "pre-dispute" as indicative of the fact that an arbitration agreement such as the one at issue here is only about constitutional rights. In their view, the "futureness" of the dispute between the parties means that the agreement is not about property at all, just the jury trial right under Section 7 of the Kentucky Constitution. Aside from the repeatedly noted fact about the very, indeed only, reason for an arbitration agreement, where does the emphasis on the futureness of something lead? When a principal, such as Mr. Wellner, gives his agent authority under a POA to collect debts, that authority manifestly includes future debts owed him by others, such as a tenant's rental payment or a former employer's final payments under an employment contract or pursuant to a pension plan. The authority to make "contracts of every nature in relation to

---

[8] Again, in our original *Extendicare* opinion, the majority acknowledged that a personal injury claim is a chose in action and therefore personal property. 478 S.W.3d at 326. The dissent noted that a chose in action is defined "generally as '[a] proprietary right in personam, such as a debt owed by another person, a share in a joint-stock company, or a claim for damages in tort' and also as 'the right to bring an action to recover a debt, money or thing.'" 478 S.W. 3d at 348, *citing* BLACK'S LAW DICTIONARY, 275 (9th ed. 2009).

17

both real and personal property" includes future property of the principal whether a stock dividend, a check for a property insurance claim, an unexpected inheritance or a run-of-the mill refund in a consumer class action. All these future things are encompassed by the POA because that is the nature of the instrument, *i.e.*, to deal with the principal's affairs in the manner stated whether or not a particular thing, event, type of property was in existence or even envisioned at the time of the execution of the POA. The majority's position would presumably respect the agent's authority in all these future matters but not the future matter of a potential legal claim (a chose in action and therefore personal property) and whether or not to agree to arbitration.

Finally, recent emphasis on arbitration, and its increasing prevalence in various facets of everyday life, has heightened the bar's awareness of the need to consider carefully what the principal wishes to authorize the agent to do on that score. Many attorneys now inquire whether the principal wishes for his or her agent to agree to arbitration, and the POA so states that preference. Going forward, I believe we can expect more clarity in POA instruments regarding the specific preferences of the principal, and that is obviously a desirable result. However, as for the many POAs that are currently in existence we must take them as we find them and construe them in a straightforward manner, not through a lens that disfavors arbitration in violation of the Supremacy Clause and not with artificial distinctions that cannot withstand scrutiny.

Because the majority's construction of the Wellner POA was and is clearly affected, "impermissibl[y] taint[ed]," 137 S. Ct. at 1429, by the same negative view of arbitration that underlay its clear statement rule, we should acknowledge that fact. We must "evaluate the document's meaning anew" and

18

determine not to "adhere . . . to [the] prior reading of the Wellner power of attorney." *Id.* For these reasons, I respectfully and strongly dissent.

Minton, C.J.; and VanMeter, J., join.

COUNSEL FOR APPELLANTS:

Donald Lee Miller II
Kristin M. Lomond
James Peter Cassidy III
Quintairos, Prieto, Wood & Boyer P.A.

COUNSEL FOR APPELLEE:

James T. Gilbert
Coy, Gilbert, Shepherd & Wilson

Richard Eric Circeo
Robert Earl Salyer
Wilkes & McHugh, P.A.

# Supreme Court of Kentucky

2013-SC-000431-I

KINDRED NURSING CENTERS LIMITED
PARTNERSHIP D/B/A WINCHESTER
CENTRE FOR HEALTH AND
REHABILITATION N/K/A FOUNTAIN
CIRCLE HEALTH AND REHABILITIATION;
KINDRED NURSING CENTERS EAST, LLC;
KINDRED HOSPITALS LIMITED
PARTNERSHIP; KINDRED HEALTHCARE,
INC.; AND KINDRED HEALTHCARE
OPERATING, INC.                                                APPELLANTS


                    ON REMAND FROM THE UNITED STATES SUPREME COURT
V.                              CASE NO. 16-32
                    CLARK CIRCUIT COURT CASE NO. 10-CI-00472


BEVERLY WELLNER, INDIVIDUALLY AND                           APPELLEE
ON BEHALF OF THE ESTATE OF JOE P.
WELLNER, DECEASED, AND ON BEHALF
OF THE WRONGFUL DEATH
BENEFICIARIES OF JOE P. WELLNER


## ORDER

The Opinion of the Court rendered November 2, 2017, is corrected on its face by

substitution of the attached opinion in lieu of the original opinion. Said correction does

not affect the holding of the original Opinion of the Court.

ENTERED: November __22__, 2017


_____
CHIEF JUSTICE JOHN D. MINTON, JR.