RENDERED: JUNE 17, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1362-MR

LANDMARK OF IROQUOIS
PARK REHABILITATION
AND NURSING CENTER, LLC; A&M
HEALTHCARE INVESTMENTS LLC;
900 GAGEL AVENUE LLC (SUBSTITUTED
DEFENDANT FOR 945 WEST RUSSELL STREET LLC);
STRAWBERRY FIELDS REIT LLC;
STRAWBERRY FIELDS MANAGEMENT SERVICE LLC;
BENCHMARK HEALTHCARE CONSULTANTS LLC;
INFINITY HEALTHCARE MANAGEMENT
CONSULTING OF KENTUCKY LLC;
JOSEPH MEISELS;
RAYMOND BELL, IN HIS CAPACITY AS ADMINISTRATOR
OF LANDMARK OF IROQUOIS PARK REHABILITATION
AND NURSING CENTER; AND CATHY ALLEN,
IN HER CAPACITY AS ADMINISTRATOR OF
LANDMARK OF IROQUOIS PARK REHABILITATION
AND NURSING CENTER                                          APPELLANTS


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE MITCH PERRY, JUDGE
                    ACTION NO. 20-CI-000237


JOSEPH P. GILL JR., AS
ADMINISTRATOR OF THE ESTATE
OF BARBARA S. GILL, DECEASED;
AND 945 WEST RUSSELL STREET LLC                            APPELLEES

OPINION
AFFIRMING IN PART, REVERSING IN PART,
AND REMANDING

** ** ** ** **

BEFORE:  ACREE, CETRULO, AND TAYLOR, JUDGES.

ACREE, JUDGE:  Appellant, Landmark of Iroquois Park Rehabilitation and

Nursing Center, LLC ("Landmark"), and others[1] appeal from the Jefferson Circuit

Court's October 1, 2020, Order denying their motion to compel arbitration.

Following a careful review of the record and the law, we affirm in part, reverse in

part, and remand with instructions as set forth more fully herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Barbara S. Gill's adult son, Joseph P. Gill, as her attorney-in-fact,

executed a Voluntary Arbitration and Limitation of Liability Agreement

("Agreement" or "Arbitration Agreement") attendant with Ms. Gill's admittance to

Georgetown Manor, a skilled nursing facility. [2, 3]  When Ms. Gill was admitted on

---

[1]  Unless otherwise noted, "Appellants" as used in this Opinion refers collectively to all appellants herein.  "Appellee" or "Mr. Gill" refers to Joseph P. Gill, as Administrator of the estate of Barbara S. Gill, deceased.

[2]  Mr. Gill's authority to execute the Agreement on behalf of Ms. Gill is not at issue.  The Amended Complaint alleges Ms. Gill was of unsound mind at all relevant times.  (Amended Complaint, para. 4, Record ("R.") 381.)

[3]  The Agreement provides:

> Signing this Agreement is not mandatory.  The Resident will
> receive the same quality care and treatment at the Facility whether
> he or she signs this Agreement or not.

January 19, 2016, Georgetown Manor was operated by AHF Kentucky-Iowa, Inc. ("AHF"), which is not a party to this action. Ms. Gill remained a resident until March 18, 2019, three days before her death. (R. 381, 404.)

On July 16, 2018, AHF entered into an Operations Transfer Agreement ("OTA") with Landmark. (R. at 798.)[4] After Ms. Gill passed away on March 21, 2019, Mr. Gill, in his capacity as Administrator of Ms. Gill's estate, brought in the Jefferson Circuit Court a complaint against Appellants alleging their negligence caused Ms. Gill personal injury.[5] Appellants filed a joint motion to compel arbitration, which was denied by order entered October 1, 2020. Therein, the circuit court determined the Agreement was unenforceable on several grounds: first, the Appellants did not sign the agreement, were not parties to it, and therefore could not enforce it; second, Appellants could not enforce the Agreement as purported third-party beneficiaries thereof; third, enforcement of the Agreement would be tantamount to an impermissible contract in perpetuity; and fourth, the

(R. 774.)

[4] The OTA was filed under seal below and was certified and transmitted to this Court in a sealed manila envelope. However, Appellants then appended the OTA as Appendix 4 to their Appellants' Brief.

[5] The Amended Complaint further asserts a cause of action for wrongful death. (R. 404.) The parties debate whether Mr. Gill may be compelled to arbitrate the wrongful death claim; however, the circuit court did not rule on this issue. We do not pass upon specific issues not reached by a trial court because "[t]he proper role for an appellate court is to review [the trial court's decisions] for error[.]" *Norton Healthcare, Inc. v. Deng*, 487 S.W.3d 846, 852 (Ky. 2016).

contractual provision at Section 3 was unenforceable as it purported to limit Ms. Gill's ability to claim damages, and such provision could not be severed from the remainder of the Agreement. (R. 794-96.)

## II. STANDARD OF REVIEW

This interlocutory appeal from an order denying a motion to compel arbitration is authorized under Kentucky Revised Statute ("KRS") 417.220(1)(a). In such a matter, "we defer to the trial court's factual findings, upsetting them only if clearly erroneous or if unsupported by substantial evidence, but we review without deference [*i.e.*, *de novo*] the trial court's identification and application of legal principles[.]" *Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 340 (Ky. App. 2001).

## III. ANALYSIS

It is well established that the party seeking to compel arbitration bears the burden of proving, in the first instance, the existence of an agreement to arbitrate. *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 590 (Ky. 2012). Although Appellants devote a significant portion of their brief to parsing whether the Federal Arbitration Act, 9 United States Code ("U.S.C.") § 2 ("FAA"), applies to the parties' dispute, "[q]uestions concerning the formation of an arbitration agreement are resolved in accordance with the applicable state law governing contract formation." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d

691, 694 (Ky. 2016) (citation omitted). *See also Genesis Healthcare, LLC v. Stevens*, 544 S.W.3d 645, 649 (Ky. App. 2017) (citations omitted) (emphasis added) ("But under both [the FAA and the Kentucky Uniform Arbitration Act ("KUAA")], a party seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate. That question is controlled by state law rules of contract formation. The FAA does not preempt state law contract principles, including . . . *which parties may be bound* by that contract."). Thus, this Court will "apply here the same fundamental principles of contract interpretation that would apply for interpreting any other type of contract." *Dunaway*, 490 S.W.3d at 694. *See also Conseco*, 47 S.W.3d at 340 (internal quotation marks and footnote omitted) (emphasis in original) ("Under either act . . . the clause is to be enforced and arbitration compelled unless the agreement to arbitrate did not encompass [the claims at issue] or unless it may be avoided upon such grounds as exist at law or in equity for the revocation of *any* contract.").

With these principles in mind, we address first whether Landmark is entitled to enforce the Agreement as an assignee of AHF Kentucky-Iowa, Inc., d/b/a Georgetown Manor. We conclude that it is unless it waived any such right.

In *Conseco*, 47 S.W.3d 335, the Wilders purchased a mobile home from Southern Living Housing, Inc., financing a portion of the purchase price. "As part of the financing arrangement, Southern Living assigned the contract to Green

Tree Financial Servicing Corporation[.]" *Id*. at 337. Green Tree was the predecessor of Conseco, which brought suit against the Wilders under the contract and "soon thereafter repossessed the mobile home." *Id*. at 338. In the Wilders' subsequent civil action seeking rescission of the contract and other relief, Conseco "responded in relevant part by moving to compel arbitration pursuant to an arbitration clause in the contract." *Id*. The trial court denied the motion, and this Court reversed, *id*. at 344, specifically describing the arbitration agreement as follows:

> The contract at issue is on a three-page, preprinted, fill-in-the blank form. In addition to a list of the parties (buyer: the Wilders, seller: Southern Living Housing, Inc., and assignee: Green Tree Financial Servicing Corporation) and an indication that the Wilders are giving a security interest in the mobile home, the first page includes details of the financing arrangements. . . .

*Id*. at 337. Notably, the *Conseco* Court did not indicate that Conseco was identified by name as a successor in the contract, nor did the Court comment on its absence as a signatory in ruling the agreement to arbitrate enforceable by Conseco. We therefore find unpersuasive Appellee's insistence that in *Conseco*, "the purchase agreement specifically listed the defendant's predecessor as the assignee[.]" (Appellee's Brief, at p. 13.) To the contrary, Conseco's predecessor-in-interest was named, while the agreement was held enforceable by and as to Conseco, an *unnamed* successor to Green Tree.

In the instant case, although Section 1 of the Agreement defines the "facility" as "Georgetown Manor [handwritten] including its officers, employees [sic] agents, administrators, and directors" (Agreement, para. 1.2., R. 774), Section 6 additionally provides:

6.    SUCCESSORS AND ASSIGNS

This Agreement binds and benefits the Parties, their respective heirs, administrators, executors, representatives, attorneys, trustees, employees, agents, subsidiaries, successors and *assigns.*

(R. 778) (emphasis added).  Arbitration agreements are placed on equal footing with other contracts under the law.  *See Ping*, 376 S.W.3d at 589 ("The thrust of both [the FAA and the KUAA] is to ensure that arbitration agreements are enforced no less rigorously than are other contracts and according to the same standards and principles.").  "In the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence."  *Dunaway*, 490 S.W.3d at 694 (internal quotation marks and citations omitted).  *See also North Fork Collieries, LLC v. Hall*, 322 S.W.3d 98, 105 (Ky. 2010) ("Generally, of course, in construing contracts courts endeavor to give effect to the parties' intent as expressed by the ordinary meaning of the language they employed.").

Here, the Operating Transfer Agreement between AHF and Landmark provides:

> To the extent assignable, AHF shall transfer, convey and assign to [Landmark], at Closing, . . . any existing agreements with residents and guarantors thereof (the "Resident Agreements"). AHF and [Landmark] shall cooperate with each other and take such steps as may be necessary in order for [Landmark] to receive the benefits under such . . . Resident Agreements.

(OTA, para. 4, Appendix 4 to Appellants' Brief, R. 798.) We are not convinced by Appellee's argument that when ownership of the facility changed hands, the Arbitration Agreement was rendered unenforceable because the "facility" as defined in the Agreement ceased to exist. An assignment of a right "is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." RESTATEMENT (SECOND) OF CONTRACTS § 317(1) (1981). It is "well settled that a contract is generally assignable, unless forbidden by public policy or the contract itself, or its provisions are such as to show that one of the parties reposes a personal confidence in the other, which he would have been unwilling to repose in any other person." *Pulaski Stave Co. v. Miller's Creek Lumber Co.*, 138 Ky. 372, 385-86, 128 S.W. 96, 101 (1910). The Arbitration Agreement, far from precluding assignment of the rights between Ms. Gill and Georgetown Manor, specifies that the parties agree that their

assigns are bound thereto. (Agreement, sec. 6, R. 778.) Appellee points to no authority stating that such an assignment of the rights and duties between AHF and Ms. Gill is invalid *per se*.

Focusing on the language of the OTA stating, "[t]o the extent assignable[,]" Appellee asserts that the Arbitration Agreement was unassignable as a contract for personal services. (OTA, para. 4, Appendix 4 to Appellants' Brief, R. 798; Appellee's Brief, at p. 11.) Paragraph 7 of the Operating Transfer Agreement provides that AHF would terminate the employment "of all employees providing services at the Facility effective as of the Closing," and that Landmark "shall determine, in its sole discretion, which of the Current Employees shall be offered employment with [Landmark]." (OTA, para. 7(a)-(b), Appendix 4 to Appellants' Brief, R. 798.) Appellee does not assert that Ms. Gill's admission to Georgetown Manor, and Mr. Gill's assent on her behalf to the Arbitration Agreement, were premised upon the facility's employment of any specific individual from whom it was anticipated that Ms. Gill would receive personal services. Nor does Mr. Gill assert that any such integral employee, in whom Mr. Gill as agent for his mother reposed personal trust, was not rehired by Landmark following the closing between AHF and Landmark under the OTA. Therefore, we do not view the Arbitration Agreement attendant with Ms. Gill's admission to the nursing facility as an unassignable contract for personal services. *See, e.g., Bd. of*

*Trustees of Michigan State Univ. v. Rsch. Corp.*, 898 F. Supp. 519, 522 (W.D. Mich. 1995)[6] (holding that contract which did "not specify any particular individuals, and . . . reflect[ed] that no particular persons were specified as essential to the Contract" was not a personal service contract).

Appellee additionally asserts that Section 6 of the Arbitration Agreement, providing the parties' assigns are bound thereto, is unenforceable because Section 7 of the Agreement required Landmark to obtain an additional signed writing from Mr. Gill upon its purchase of the business. We disagree. Section 7 of the Arbitration Agreement provides, in relevant part:

> 7. FULL AGREEMENT
>
> This Agreement supersedes all prior agreements understandings and representations, whether written or oral to or between the parties with respect to its subject matter (including any representations made at the time of admission) and constitutes a complete and exclusive statement of the terms of the Agreement between the Parties with respect to its subject matter.
>
> This Agreement may not be amended, supplemented, or otherwise modified except by a written agreement signed by both Parties. . . .

The foregoing language constitutes a contractual merger or integration clause. Such a clause is intended to bar the admission of parol evidence "to vary the terms of [the] writing." *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 260 (Ky.

---

[6] The foregoing is cited as persuasive or illustrative case law only, not as mandatory authority.

App. 2007).  Instead, "[w]hen the negotiations are completed by the execution of the contract, the transaction, so far as it rests on the contract, is merged in the writing." *Id.*  "The parol evidence rule is not a procedural device but, rather, a substantive rule of law that prevents the introduction of oral statements into evidence to alter a written agreement, per force lending integrity to writings." *Id.* at 261.

Section 7 lends no support to Appellee's assertion that a subsequent written modification was a predicate to assignability of the contract because the Agreement *already* contained a provision under which the parties explicitly agreed that their assigns were bound.  Enforcement of the assignment clause is consistent with, not in derogation of, the plain language of Section 7.  As noted previously, the *Conseco* Court upheld enforcement of the arbitration agreement by a successor to the financing company without reference to any requirement that the Wilders have signed a new agreement specifically naming the successor, Conseco.  (*See supra* at p. 6-7; Agreement, sec. 6, R. 778.)  *See also Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 927-28 (6th Cir. 2000) (internal quotation marks omitted) (emphasis added) (in applying Kentucky law and determining that noncompetition agreement executed by employee of group purchasing organization for hospitals was enforceable following assignment, holding that "*assignments and modifications are completely different concepts*, and . . .

assignability is not impacted by boilerplate modification provisions"; "the terms of Kethan's employment *were not modified* by the assignment of his contract and the substitution of [the assignee]. Following the assignment, Kethan's contractual rights and duties as an employee did not change. The only thing that changed was the entity now entitled to enforce the terms and conditions that Kethan had previously agreed to when he entered into his employment agreement."); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 317(2)(a) (1981) ("A contractual right can be assigned unless . . . the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him.").

We next turn to the circuit court's ruling that the Agreement is unenforceable because it contains a provision "purport[ing] to limit Ms. Gill's full access to damages[,]" particularly punitive damages. (*See* Agreement, sec. 3, R. 777-78.) Under Kentucky law, a contract is not necessarily unconscionable or unenforceable simply because it contains an unenforceable provision.[7] *See generally Edleson v. Edleson*, 179 Ky. 300, 200 S.W. 625, 629 (1918) ("Where a

---

[7] To be clear, we do not reach and do not determine today the enforceability of Section 3 of the Agreement.

contract . . . consists of several covenants and agreements with regard to different subjects, and one of the covenants is illegal and vicious, the general rule which prevails is that, if the illegal covenant of the contract can be eliminated from it without impairing its symmetry as a whole, the courts will . . . eliminate the obnoxious feature and enforce the remainder of the contract . . . .); *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 565 (Ky. 2012) (holding that a contractual "provision imposing a confidentiality requirement upon the litigants to arbitration proceedings is void and is severable from the remaining portions of the agreement").

Applying *Mortgage Electronic Registration Systems, Inc. v. Abner*, 260 S.W.3d 351 (Ky. App. 2008), as the Appellee desires does not result in an unconscionable contract because the clause limiting damages located at Section 3 of the Agreement neither causes it to be so, nor is it unseverable under Section 5. (Agreement, sec., 3, R. 777-78; Appellee's Brief, at p. 18; *infra* at p. 16-19.)

In *Abner*, this Court affirmed the circuit court's denial of a motion to compel arbitration of a foreclosure matter. The arbitration clause at issue in *Abner* was located within the mortgage contract, providing that the arbitrator could award damages limited to "actual and direct damages," and that in no event could the awarded damages "include consequential, punitive, exemplary or treble damages." 260 S.W.3d at 352. Our Court held that "an arbitration clause that contains a

substantial waiver of a parties' [sic] rights is unenforceable[,]" *id.* at 354, emphasizing the arbitration agreement itself unconscionably limited the plaintiffs' rights to statutory and punitive damages. However, subsequent to *Abner*, the United States Supreme Court made clear that the FAA requires arbitration agreements be "put . . . on an equal plane with other contracts." *Kindred Nursing Centers Ltd. Partnership v. Clark*, ___ U.S. ___, 137 S. Ct. 1421, 1425, 197 L. Ed. 2d 806 (2017).[8] The inquiry therefore is whether ordinary contract principles support enforcement of a contract containing a (purportedly) invalid limitation of damages provision. But at this juncture, "the Court need not consider whether the limitation . . . is itself enforceable if . . . the clause is severable from the agreement to arbitrate." *Brookdale Senior Living Inc. v. Stacy*, 27 F. Supp. 3d 776, 789 (E.D. Ky. 2014).[9]

An arbitration agreement containing a severable clause limiting the defendants' liability for damages was determined enforceable in *Brookdale*, *supra*. There, the United States District Court explained that the limitation of damages provision held unconscionable in *Abner* was inextricably "intertwined" with the arbitration clause itself; it opined that "*Abner* does not stand for the proposition

---

[8] *See also N. Kentucky Area Dev. Dist. v. Snyder*, 570 S.W.3d 531, 535 (Ky. 2018) (quoting *Kindred Nursing*, 137 S. Ct. at 1426) (the FAA "displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements.").

[9] *Brookdale* is cited herein as persuasive, not mandatory, authority.

that all arbitration agreements are unenforceable simply because the contract contains a separate and unconscionable provision." 27 F. Supp. 3d at 789-90. The Court distinguished *Abner* on its facts because in that case, "the arbitration clause itself directly limited the arbitrator's ability to award damages and expressly prohibited it from modifying the terms of the contract." *Id.* at 790. Thus, in *Abner*, "[t]here was no way for an arbitrator to sever the unconscionable clause from the rest of the agreement." *Id*. *See also Francis v. Cute Suzie, LLC*, No. 3:10-CV-00704, 2011 WL 2174348, at *4 (W.D. Ky. Jun. 2, 2011) (granting motion to compel arbitration and distinguishing *Abner* because "[i]f, upon submission of this matter to arbitration, the arbitrator determines that the limitation of damages provision . . . is unconscionable or otherwise unenforceable, he would have the power to disregard it pursuant to the [contract's] severability clause.").

At issue here is Section 5 of the Agreement, which provides, in pertinent part:

5. NONSEVERABILITY

5.1 If the [arbitration] Panel or a proper court determines that **any** of the Terms and conditions of this Agreement are unenforceable for **any** reason, and an award is made inconsistent with it or in violation of it, the Party adversely affected has the right to terminate this Agreement by serving upon the Arbitrators and opposing Party or that Party's attorney, a Notice of Termination within 10 business days of the date of the Arbitration decision or court decision. If a Party fails to timely serve the Notice

of Termination, the Arbitration decision and award will become final, binding, and enforceable. . . .

(R. 778) (emphasis added). The circuit court determined that the "[A]greement contained only one exception to the nonseverability provision which pertained to the Patient Bill of Rights[10] and does not apply here" (R. 796), a reference to the third paragraph of Section 7 of the Agreement, which provides:

> If any Term or Condition is determined to violate the Patient Bill of Rights, that Term or Condition, including any Dispute or Claim, will be excluded so as not to violate the Patient Bill of Rights, and any remaining Terms and Conditions, including any surviving Disputes or claims, will remain in force and subject to private, binding Arbitration, as this Agreement provides.

(R. 779.)

We conclude the circuit court erred by failing to consider all provisions of the Agreement as a whole in ruling on the severability issue. It is true that Section 7 contains the foregoing provision addressing severability of any term or condition found violative of KRS 216.515, the nursing home "Patient Bill of Rights." But Section 5 permits any unenforceable term or condition to be severed from the remainder of the Agreement.[11]

---

[10] *See* KRS 216.515.

[11] We further note that Section 2.1.3 of the Agreement grants the arbitration panel authority to address disputes "about enforceability, severability, [and] unconscionability" of the Agreement. (R. 775.)

-16-

We find persuasive the decision in *ManorCare Health Services, Inc. v. Stiehl*, 22 So.3d 96 (Fla. Dist. Ct. App. 2009). There, the Court construed an arbitration agreement similar to the Agreement at issue here. In *ManorCare*, the agreement contained remedial limitations capping the plaintiff's "non-economic damages at $250,000 and eliminat[ing] punitive damages." *Id.* at 98. The *ManorCare* agreement was a voluntary, stand-alone agreement, as in our case. *Id.* at 97-98. It contained a section entitled "Nonseverability," which again, similar to the instant case, provided that "[i]n the event any provision of this agreement is determined by a court of competent jurisdiction, an arbitrator or arbitrator panel to be unenforceable for any reason, either party may thereafter cancel this agreement by giving written notice to such effect within 10 days after such determination. . . ." *Id.* at 98. The Court reversed the trial court's determination that the agreement was unenforceable because of the remedial limitation provision, explaining:

> [L]anguage contained within the nonseverability clause anticipates that certain provisions of the Agreement may be deemed invalid and severed, in which case the parties would have the option of either proceeding with arbitration or withdrawing from the [a]greement. Additionally, we do not find that the remedial limitation is so interrelated and interdependent that it cannot be severed by the arbitrator if necessary: the essence of the contract is an agreement to submit disputes to binding arbitration. We therefore conclude that the validity of the remedial limitations may be considered by the arbitrator and, if the limitations are found invalid, severed from the Agreement.

> We have decided the single gateway issue presented on appeal: whether a valid agreement to arbitrate exists between [the plaintiff] and [the facility]. Because the validity of the remedial limitations may be determined by the arbitrator, we do not proceed any further.

*Id.* at 100-01. *See also Francis*, 2011 WL 2174348, at *4 (in applying Kentucky law, holding that an arbitration agreement was not substantively unconscionable under *Abner*, notwithstanding a limitation of liability clause, because under the terms of the contract, "[i]f upon submission of this matter to arbitration, the arbitrator determines that the limitation of damages provision . . . is unconscionable or otherwise unenforceable, he would have the power to disregard it pursuant to the . . . severability clause.").

This Court will not "construe a contract at variance with its plain and unambiguous terms." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002). Moreover, we cannot disregard portions of the Arbitration Agreement as written, but instead must read the contract as a whole, attempting to harmonize its provisions and "giving effect to all parts and every word in it if possible." *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986); *see also Cantrell*, 94 S.W.3d at 384-85. Thus, reading the Agreement as a whole and harmonizing all provisions therein, we do not find that it fails for unconscionability because if the limitation on liability provision is unconscionable,

an issue we do not reach today, the arbitration panel may sever that unconscionable provision from the enforceable terms of the Agreement.

Appellee additionally claims the Agreement is unconscionable because Section 2.1.2 provides:

> **By submitting all Disputes to binding Arbitration, each Party has its right to file a lawsuit and to have a trial by jury for an action seeking monetary damages arises out of a Dispute, claim or other matter covered by this Agreement, except as this Agreement provides**.

(R. 775) (emphasis original). Appellee asserts the foregoing provision is misleading because it "disingenuously and inaccurately informs Ms. Gill in bold print that she maintains her right to file a lawsuit and to have a trial by jury[.]" (Appellee's Brief, at p. 18.) But the inclusion of the clause "except as this Agreement provides" fairly places the reader on notice that the right to a jury trial is waived for the claims set forth in the Agreement to arbitrate. (*See* Agreement, Section 2.1.2, R. 775.)

In *Francis*, the plaintiff argued the arbitration provision was procedurally unconscionable, in part, "because it was 'buried' within a paragraph[.]" 2011 WL 2174348, at *3. Noting that "the presentation of the clause is not a model of clarity," the Court nonetheless rejected the plaintiff's position because the clause "was written in clear, legible type[,]" and the Court

-19-

did "not agree that requiring a party to a contract to read four sentences into a paragraph is so onerous or deceptive as to be procedurally unconscionable." *Id.*

Having concluded that Landmark is entitled to enforce the Arbitration Agreement as an assignee thereof unless it waived that right, and that the arbitration panel may sever any provisions of the Agreement which are unenforceable, we turn to the enforceability of the Agreement by the remaining Appellants. Appellants do not acknowledge that they are disparately situated with respect to their attempts to enforce the Arbitration Agreement. In other words, only Landmark constitutes an "assign" under the Agreement owing to the OTA under which it assumed the operation of the nursing home, including the performance of contracts with its residents.

The circuit court ruled that the "defendants cannot enforce the [A]greement as alleged third-party beneficiaries" because they have not "proven that the agreement was made for [their] actual and direct benefit[.]" (R. 795-96.) "Five theories for binding non-signatories to arbitration agreements have been recognized: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel." *Olshan Foundation Repair and Waterproofing v. Otto*, 276 S.W.3d 827, 831 (Ky. App. 2009) (citation omitted). As the parties seeking to compel arbitration, Appellants bore the burden of showing they constitute non-signatories who may enforce the Agreement. *Ping*,

376 S.W.3d at 590. Although we have determined that Landmark, absent waiver, is a non-signatory entitled to enforce the Agreement under the contractual assignment clause, the circuit court correctly noted the dearth of evidence that Mr. Gill, in the process of admitting his mother to the facility and in acting as her agent, intended to benefit any or all of the non-signatory Appellants such that an equitable theory of enforcement applies. *See Sexton v. Taylor Cty.*, 692 S.W.2d 808, 810 (Ky. App. 1985) (rejecting third party beneficiary argument where "[t]here [was] simply no evidence appearing in the record tending to show that the parties made the contract for the benefit of appellant. Nor does it appear from the record that there was ever any intent, expressed or otherwise, on their part to do so.").

Appellants rely heavily on the theory of equitable estoppel in asserting that each of them may enforce the Agreement. In *North Fork Collieries, LLC v. Hall*, 322 S.W.3d 98 (Ky. 2010), Hall and his company, Traveler Coal, LLC, obtained a business loan from Community Trust Bank secured by "various mortgages and other liens as well as by the personal guarantees of Hall and his wife[.]" *Id.* at 100. North Fork subsequently purchased Traveler, and the parties executed an Asset Purchase Agreement contemporaneous with an Assumption Agreement under which North Fork and Traveler "both promised the Bank . . . to jointly and severally assume [or remain] and be bound as . . . joint and several

primary obligor along with [the other]." *Id.* at 101 (internal quotation marks omitted). The former contract contained an arbitration clause, while the latter agreement did not. *Id.* North Fork defaulted on the loan, and Hall, his wife, and Traveler brought suit against North Fork and the Bank. North Fork moved for dismissal of the complaint or to compel arbitration. *Id.* Noting that the Asset Purchase Agreement, and not the Assumption Agreement, would determine the rights between North Fork and Hall,[12] the Court held that because "Hall and his wife are claiming the direct benefit of the Asset Purchase Agreement's loan assumption and indemnity provisions[,]" they were "estopped from disavowing the Agreement's arbitration provision." *Id.* at 106.

In *Olshan*, the Ottos purchased a home from Jansen, who had contracted with Olshan Foundation Repair and Waterproofing to "to undertake . . . work on the foundation . . . ." 276 S.W.3d at 828. Prior to Jansen's contracting with Olshan, the previous owner of the home, Schnelle, also contracted with Olshan for repairs on the home's foundation. *Id.* Following flooding of the basement, "the Ottos contacted Olshan," claiming a right to performance under the "fully-transferrable lifetime warranty" provided by Olshan to both Schnelle and

---

[12] The Court held that the Assumption Agreement, "in short, concerns North Fork's and Hall's relationship with the . . . Bank, not with each other. It has nothing to say about which of them, if either, is responsible to the other for the Bank debt and thus it cannot resolve the issue Hall seeks to litigate." *Id.* at 103.

Jansen. *Id.* The Court noted the "fundamental tenet of contract law" that "the parties must enter into a meeting of the minds in order to form an enforceable contract." *Id.* at 831. Although the Ottos, as non-signatories to the contract, did not have a meeting of the minds with Olshan, the Court concluded that "[t]hird parties such as the Ottos . . . may seek to enforce the terms of the contract by showing that the parties to the contract intended by their agreement to benefit third parties directly. Such intent need not be expressed in the agreement itself; it may be evidenced by the terms of the agreement, the surrounding circumstances, or both." *Id.* (citation omitted). The Court determined that "uncontroverted documentary evidence in the form of warranty certificates" supported the Ottos' claim that they were third party direct beneficiaries, particularly because the warranties expressly provided coverage "to all future owners of this home[.]" *Id.* Thus, the Ottos, who were attempting to enforce the contracts and obtain performance thereunder as third-party beneficiaries, were estopped from denying the validity of the provisions requiring arbitration of their claims. *Id.* at 832 ("[W]hile the Ottos may not be bound to the agreements under contract law principles, their decision to seek warranty repairs as third party direct beneficiaries under the contracts brings with it the obligation to resolve disputes in accordance with the contracts' terms").

Both *North Fork* and *Olshan* are readily distinguishable from the instant case.[13] Here, Appellee, the party against whom enforcement is sought, is not "claiming the direct benefit" of the Arbitration Agreement, unlike Hall and his wife in *North Fork*, and unlike the Ottos in *Olshan*. Appellee is not attempting to enforce the Arbitration Agreement, nor any contract, against the non-signatory defendants; each of his claims sounds in tort, not in contract. (*See* Amended Complaint, R. 397-406.) We cannot say, therefore, that he is estopped from denying that Ms. Gill's claims against all Appellants should be arbitrated based on equitable principles.

However, as an assignee, Landmark stands in the shoes of its assignor, AHF. *See generally Hill v. Turner*, 56 S.W. 642, 644 (Ky. 1900) (holding the appellants, as assignees, "stand in the shoes of their assignor . . . and have the same rights that he had, and no more"). Returning to Section 1.2 of the Agreement, the "facility" is defined as including "Georgetown Manor's" "officers, employees [sic] agents, administrators, and directors." The circuit court did not reach the issue of whether any Appellant is entitled to enforce the Agreement, as a

---

[13] The unpublished case of *Palazzo v. Fifth Third Bank*, No. 2011-CA-000034-MR, 2012 WL 3552633 (Ky. App. Aug. 17, 2012) (unpublished), also cited by Appellants, is likewise unavailing because there, the plaintiff "treat[ed] Fifth Third Securities and [Fifth Third] Bank as one entity[,]" alleging "that Fifth Third 'breached its contracts with' her[.]" *Id.* at *2. Citing *North Fork*, 322 S.W.3d 98, the Court specifically held that "Palazzo cannot, on the one hand, seek the benefit of those alleged contracts between her and Fifth Third Securities and the Bank, and, on the other hand, disavow the arbitration provision that is part of those alleged contracts." *Id.*

matter of contract, based upon the above language. Likewise, the circuit court stated that "[b]ecause [it] finds that there is not an enforceable agreement, [it] does not find it necessary to reach the issue of waiver."[14] (R. 796.) On remand, the circuit court shall make additional findings as to which of the Appellants other than Landmark, if any, are entitled to enforce the Arbitration Agreement under the contractual provisions therein and whether Landmark and/or any Appellant waived their rights to enforce the Agreement.[15]

Finally, we disagree with the circuit court's assessment that enforcement of the Agreement as to any Appellant "would mean that the contract could continue into perpetuity" impermissibly. (R. 796.) As aptly noted by Appellants, Ms. Gill's residency at the nursing home could in no way continue into perpetuity – it would necessarily continue only through her death or through her discharge from the facility, and "[u]pon her discharge, no matter the [facility] operator, the Agreement would have become irrelevant, other than for suits brought on the basis of her residency." (Appellants' Brief, at p. 19.)

---

[14] Appellee argued below that Appellants, including Landmark, waived their right to insist upon arbitration by participating in the underlying civil action for a period of approximately eight months, including propounding discovery and filing (and subsequently voluntarily remanding) a motion to dismiss certain named defendants. *See* 9/16/20 Video Record, at 11:07:35 *ff.*

[15] The circuit court may stay litigation while the arbitrable claims against the parties entitled to enforce the Agreement are submitted to arbitration. *See North Fork*, 322 S.W.3d at 106.

## IV. **CONCLUSION**

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.  We view any remaining issues raised in the parties' briefs as irrelevant or unnecessary to this Opinion.

CETRULO, JUDGE, CONCURS.

TAYLOR, JUDGE, CONCURS IN RESULT ONLY.

| BRIEFS FOR APPELLANTS: | BRIEF FOR APPELLEE JOSEPH P. GILL, JR.: |
|---|---|
| Donald L. Miller, II | |
| Brandon C. R. Sword | Lisa E. Circeo |
| Louisville, Kentucky | Megan L. Adkins |
| | Ashley L. Daily |
| | Lexington, Kentucky |